## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

|  |  |
|---|---|
| **FREDERICK J. GREDE**, not individually, but as Liquidation Trustee and Representative of the Estate of Sentinel Management Group, Inc., ) ) ) ) ) | FILE: JANUARY 12, 2009<br>09CV193<br>JUDGE NORGLE<br>MAGISTRATE JUDGE COX<br>RCC |
| Plaintiff, ) | |
| v. ) ) | **Case No._____** |
| **DELORES E. RODRIGUEZ,** ) | |
| **BARRY C. MOHR, JR.,** ) | **JURY TRIAL DEMANDED** |
| **JACQUES DE SAINT PHALLE,** ) | |
| **KEEFE, BRUYETTE & WOODS, INC., and** ) | |
| **COHEN & COMPANY SECURITIES, LLC** ) ) | |
| Defendants. ) | |

## COMPLAINT

Plaintiff Frederick J. Grede, not individually but as Liquidation Trustee and Representative of the Estate of Sentinel Management Group, Inc. ("the Trustee"), hereby states for his Complaint as follows:

## NATURE OF THE ACTION

1.     This is a complaint by the Trustee against securities brokers Delores E. ("Doli") Rodriguez, Barry C. Mohr, Jr., Jacques de Saint Phalle ("de St. Phalle"), Keefe, Bruyette & Woods, Inc. ("KBW"), and Cohen & Company Securities, LLC ("Cohen") for aiding and abetting a breach of fiduciary duty, commercial bribery, securities fraud, violation of the Illinois Blue-Sky law, violation of the Illinois Consumer Fraud Act, negligence and unjust enrichment. In addition, the Trustee seeks avoidance of transfers of cash and securities of well over $130 million to defendant KBW and of over $150 million to defendant Cohen made with the actual intent to hinder, delay and defraud Sentinel's creditors.

2.      The scheme began in approximately 2004, when de St. Phalle, Rodriguez and Mohr were employed by defendant KBW, and included other KBW officials as well. When Rodriguez and Mohr left KBW in 2006, they continued the scheme at their new employer, Cohen.  For a short time, KBW also continued to pursue the scheme without Rodriguez and Mohr.

3.      Sentinel was a cash manager for various customers, including futures commission merchants, hedge funds, and individuals.  As each of the defendants well knew, Sentinel was required to invest its customers' funds exclusively in safe, highly liquid securities, such as government securities and certain investment-grade corporate bonds.

4.      Nevertheless, defendants recommended and sold to Sentinel, through Sentinel's head trader, Charles Mosley, hundreds of millions of dollars worth of structured finance products.  These securities were wholly unsuitable for Sentinel.  They were unsuitable for Sentinel's customer portfolios because they were risky, illiquid securities with 30-year maturities, characteristics completely inconsistent with Sentinel's duty to invest customer funds in only safe, high-grade securities.  And they were unsuitable for Sentinel's own small proprietary portfolio because Sentinel did not have anywhere close to sufficient assets to purchase that volume of securities.  Defendants knew, or should have known, that these securities were unsuitable for Sentinel and sold them to Sentinel anyway.

5.      Defendants sold these securities to Sentinel utilizing two corrupt and deceptive methods.  First, defendants compromised, co-opted, duped and bribed Mosley by improperly providing him and his subordinates with lavish meals, wine, entertainment, lodging, travel, tickets to sporting events, personal checks, and other benefits and things of value.  In the case of defendant de St. Phalle, while he was employed by KBW, those benefits included a visit to strip

clubs and paying for "lap dances" for Mosley at that club.  Second, having compromised Mosley's independent judgment, one or more of the defendants furthered their deceptive scheme by providing Sentinel with false and misleading information about the liquidity of the securities, particularly KBW's and Cohen's ability and willingness to make a market in these securities, and the ratings of certain of the securities.

6.      Defendants participated in this conduct in order to earn huge income, commissions, compensation and profits associated with the sale of these securities.  To magnify this unlawful income, defendants traded in and out of various similar positions when there was no legitimate reason for Sentinel to engage in such transactions.

7.      In August of 2007, Sentinel collapsed under the weight of the illiquid and risky securities it had purchased, including the securities from KBW and Cohen, and the huge debt it had incurred to finance the purchase of such securities.  The securities Sentinel was left holding turned out to be worth only a fraction of their face value, and many were worth nothing at all.

## JURISDICTION AND VENUE

8.      This Court has jurisdiction pursuant to 28 U.S.C. § 1334(b) because this proceeding is related to and arises under the Chapter 11 case, *In Re Sentinel Management Group, Inc.*, pending in the United States Bankruptcy Court for the Northern District of Illinois, Eastern Division, as Case No. 07 B 14987.  In addition, this Court has jurisdiction pursuant to 28 U.S.C. § 1331 in that certain of the claims arise under the laws of the United States, specifically, 15 U.S.C. § 78j(b) and Rule 10(b)-5 and 11 U.S.C. §§ 548(a)(1)(A) and 550(a).  The Court also has supplemental jurisdiction over counts arising under State law pursuant to 28 U.S.C. § 1367.

9.     Venue is proper under 28 U.S.C. § 1409(a) because the matter relates to and arises under a bankruptcy proceeding in this District and under 28 U.S.C. § 1391(b) in that a substantial part of the events giving rise to the claim occurred in this District.

## THE PARTIES AND RELATED PERSONS

10.     Plaintiff Frederick J. Grede served as the chapter 11 trustee for Debtor Sentinel Management Group, Inc., duly appointed under Section 1104 of the Bankruptcy Code by Orders dated August 23 and 29, 2007.  On December 15, 2008, the Bankruptcy Court entered an Order in In re Sentinel Management Group, Inc. confirming the Fourth Amended Chapter 11 Plan of Liquidation for Sentinel Management Group, Inc. (the "Plan").  The Effective Date of the Plan was December 17, 2008.  On the Effective Date, in accordance with § 6.3 of the Plan and the Bankruptcy Court's Order confirming the Plan, the chapter 11 trustee resigned, and the Liquidation Trustee for the Sentinel Liquidation Trust became the representative for Sentinel Management Group, Inc.'s Estate.  Under the Plan, as Estate representative the Liquidation Trustee is responsible for and has standing to prosecute the claims and causes of action set forth in this Complaint.  Plaintiff Frederick J. Grede is the Liquidation Trustee.

11.     Sentinel is an Illinois corporation which was at relevant times headquartered in Northbrook, Illinois.  Sentinel was registered with the Securities and Exchange Commission ("SEC") as an investment adviser and with the Commodity Futures Trading Commission ("CFTC") as a futures commission merchant ("FCM").

12.     Defendant Dolores E. Rodriguez ("Rodriguez") is, on information and belief, a resident of New York, New York.  Rodriguez also owns a home in Delray Beach, Florida.  From August 2003 until April 2006, she was employed by defendant KBW.  From May 2006 through February 2008, she was employed by defendant Cohen.

4

13.     Defendant Barry C. Mohr, Jr. ("Mohr") is, on information and belief, a resident of Holmdel, New Jersey.  From January 2003 through April 2006, he was employed by defendant KBW.  Since May 2006, he has been employed by defendant Cohen.

14.     Defendant Jacques de Saint Phalle ("de St. Phalle") is, on information and belief, a resident of Greenwich, Connecticut.  De St. Phalle also owns a home in Coral Gables, Florida. Between May 2002 and February 2006, de St. Phalle was employed by defendant KBW.  De St. Phalle was one of the persons who created "PreTSLs," one type of unsuitable securities defendants sold to Sentinel.

15.     Defendant KBW is a corporation organized under the laws of the State of New York, with its principal place of business in New York, New York.  KBW is registered with the SEC and the Financial Industry Regulatory Authority ("FINRA") as a broker-dealer.  KBW conducted various businesses, including acting as a broker-dealer of equity and debt securities, underwriting securities, trading securities for its own account, and creating and marketing complex structured finance products.

16.     Defendant Cohen is a limited liability company organized under the laws of the state of Delaware with its principal place of business in Philadelphia, Pennsylvania.  Cohen is registered with the SEC and FINRA as a broker-dealer.  Cohen conducted various businesses, including acting as a broker-dealer of equity and debt securities, underwriting securities, trading securities for its own account, and creating and marketing complex structured finance products.

## FACTUAL BACKGROUND

## SENTINEL'S CASH MANAGEMENT BUSINESS

17.     Sentinel primarily managed investments of short-term cash for various clients, including other FCMs, hedge funds, financial institutions, pension funds and individuals.

18.     Sentinel solicited clients by offering them the opportunity to participate in several safe investment programs, each of which purportedly had its own investment policy designed to meet the requirements and risk profiles of different types of clients.  Each of these programs was supposed to provide safety of principal and same-day liquidity.  Depending on the source of the funds being invested, Sentinel assigned client assets into one of three account pools referred to within Sentinel as SEG 1, SEG 2 and SEG 3.  Assets in each of the accounts were supposed to be segregated and used solely for the benefit of clients in that segregated account.

19.     SEG 1 was supposed to contain customer funds and property of registered FCMs. The investment of FCM customers' funds is subject to the provisions of the Commodity Exchange Act ("CEA"), 7 U.S.C. § 1 et seq., and the rules and regulations promulgated thereunder by the CFTC, 17 C.F.R. § 1.1 - 190.10, including the strict investment standards embodied in CFTC Rule 1.25, 17 C.F.R. § 1.25, and generally is supposed to consist of only the highest grade securities and similar highly liquid investments.

20.     SEG 2 was supposed to contain the funds and property of FCM customers that are engaged in trading at foreign exchanges, invested in accordance with CFTC Rule 30.7, 17 C.F.R. § 30.7.  Rule 30.7 imposes restrictions on the investment of customer funds similar to those in Rule 1.25.

21.     SEG 3 was supposed to contain assets of all other types of clients, including FCMs' own (i.e., non-customer) funds, hedge funds, trust accounts, endowments and individuals. About 75% in amount of the SEG 3 investments were supposed to be invested in Rule 1.25 compliant securities.  Even Sentinel's highest-return "Prime" portfolio (which represented a portion of the SEG 3 pool) was, according to Sentinel's website, invested in only short-term commercial paper rated A1/P1 or better or  investment grade corporate bonds.

22.     In addition to the supposed SEG 1, SEG 2, and SEG 3 customer pools, Sentinel managed a much smaller "House" or "Street" portfolio, which was a portfolio of securities traded by Sentinel for the ultimate benefit of certain insiders.

23.     Sentinel was required under federal law and its agreements with its customers to segregate the assets of each of the customer SEGs from Sentinel's own funds and those of other customer groups.

**THE ESOTERIC SECURITIES RECOMMENDED AND SOLD BY DEFENDANTS**

24.     Defendants recommended and sold to Sentinel, through Mosley, a large number of collateralized debt obligations ("CDOs"), securities that were wholly unsuitable for Sentinel. These CDOs, issued by several different companies, were marketed under the brand names "PreTSL," "Alesco," "Taberna," "Kleros, " and "Regional Diversified" (collectively "the Esoteric Securities" hereafter).

25.      "PreTSL" is the acronym for Preferred Term Securities Limited, a structured investment product that was originally created by KBW and another brokerage firm, First Tennessee ("FTN").  In approximately 2000, KBW and FTN began the PreTSL program and approached a variety of regional banks and savings and loans to assist them in raising capital, primarily by issuing trust preferred securities. Trust preferred securities are an attractive means for banks to raise capital because, while they pay interest like debt securities, they are treated as capital for regulatory purposes.  KBW and FTN created various PreTSL trust vehicles which issued multiple classes of notes to investors.  The note proceeds were used to purchase trust preferred securities issued by various depository institutions.  In that way, the PreTSL notes are backed or collateralized by the underlying trust preferred securities issued by the depository

institutions. (In more recently issued PreTSLs, the collateral pool was expanded to include issuers of trust preferred securities in the mortgage REIT and insurance industries.)

26. The typical PreTSL capital structure consists of multiple series of notes, each series of which has a specified interest rate and a different priority position as to distributions of income and principal. The different series of notes are referred to as tranches. The senior note tranche generally has first priority of payment and the lowest stated interest rate. The stated interest rates for each tranche increase as the payment priority level decreases. The lowest payment priority level is the "income note" which has no stated interest rate but receives all funds available for distribution after payment of the higher priority notes. In the aggregate, KBW and FTN created twenty-eight PreTSL trust structures, which issued CDOs secured by between 50 to 100 different underlying obligors, with a face amount typically ranging from $600 million to $1.6 billion per offering.

27. Alesco was a CDO similar to the PreTSL, but was marketed by Cohen. Like the PreTSL structure, the Alesco capital structure consisted of multiple tranches. For Alesco issues, the highest priority for payment was generally class A or X, followed in descending order of priority (and ascending risk and stated interest rates) by classes B, C, D, E. Each class may have one or more subclasses. The lowest tranches of Alesco notes were combination notes, private placement notes, and income notes, with those notes having the highest risk and typically having no stated rate of interest.

28. These Alesco notes were generally non-recourse notes of the issuer secured by pledges of specified collateral. The funds to pay the notes came from the payments received on the collateral securities. The collateral generally consisted of trust preferred securities issued by banks and insurance companies, subordinated notes of banks and insurance companies and

surplus notes and senior securities of insurance companies along with the issurers rights under various ledger agreements.   The payments priority, collateral, and redemption and other provisions of these securities rendered them virtually incomprehensible to many sophisticated institutional investors.  With respect to at least some of the Alesco offerings, a Cohen affiliate received an additional fee for managing the collateral.

29.        Taberna was another CDO, also marketed by Cohen.  The Taberna notes were also issued in tranches typically ranging from class A (highest priority and lowest risk) to classes E or F.   The Taberna issuer also issued preferred securities, and combination notes which consisted of a lower tier note and preferred securities (lowest priority and highest risk).   Again, each of the above classes could have multiple sub-classes.   The Taberna notes were also non-recourse notes secured by pledges of collateral consisting of trust preferred securities, senior notes or subordinated notes issued by real estate investment trusts (REITs) or real estate operating companies (REOCs).   Commercial mortgage-backed securities could also be used as collateral.   The proceeds to pay the Taberna CDOs depended upon the receipt of payments on these collateral securities.   Like PreTSLs and Alescos, Tabernas were extraordinarily complex securities beyond the comprehension of many sophisticated institutional investors.

30.        Kleros was also a CDO marketed by Cohen.  The Kleros notes were typically issued in tranches from Class A (highest priority, lowest risk) to E.   Like Alesco, Kleros offerings, included preferred shares (last in line) and combination notes consisting of one tier of a note plus preferred shares (lowest priority and highest risk).   The Kleros notes were limited recourse notes secured only by designated collateral which provided the source of funds to pay the notes.   The Kleros collateral consisted of a wide range of asset-backed securities (ABS) as well as even more exotic synthetic securities, the value of which fluctuates based on the

performance not of any underlying assets but of "reference securities." The ABS in the Kleros pools consisted of residential mortgages-backed securities, other CDOs, commercial mortgages-backed securities, ABS REIT Debt Securities, Hybrid Securities and Credit Default Swaps. These securities were truly exotic in the extreme, and beyond the understanding of many sophisticated institutional investors. In addition, a Cohen-affiliated company managed the Kleros collateral for which it received an additional fee.

31.     Regional Diversified was a CDO product issued by Citigroup. As with the other CDOs, the lowest priority for payment was the income notes, which had no stated rate of interest and which carried the highest risk.

32.     Generally, the Esoteric Securities might not mature for 30 years or more, and the secondary market for these instruments was limited. Many of the Esoteric Securities were physical (i.e., paper) securities which were not registered in the national or international book entry trading systems.

33.     Many of the Esoteric Securities, particularly the lower tranches, did not qualify as investment grade securities. Income notes, for example, were not rated by any NRCRA -- nationally recognized credit rating agencies -- as generally would be required to be considered investment grade. Such notes generally provided "targeted" yields of 15 to 20%, but carried corresponding high risk because they were last in line for the distribution of income and principal. The inherent risk of being the lowest priority noteholder was further exacerbated by the terms of certain underlying Trust Preferred Securities pursuant to which the depository institutions that issued the Trust Preferred Securities could defer making any payments on the notes for up to five years if the depository institution could not meet its internal targeted cash flows.

34.     Moreover, even those tranches of the Esoteric Securities that were rated by NRCRAs often had qualifications attached to those ratings that in sum and substance meant that those ratings did not correspond to the comparable ratings of corporate bonds and that those tranches were not "investment grade" as that term is commonly used in the investment community.  Defendants nonetheless falsely represented to Sentinel that these "rated" notes were investment grade when at least certain of them were not.

## SENTINEL'S FINANCING OF ESOTERIC SECURITIES

35.     Certain insiders at Sentinel treated the funds of all customers and those of Sentinel itself as a single, commingled pool.  Head trader Charles Mosley purchased huge quantities of the Esoteric Securities with funds from this pool, employing a massive leveraging scheme that was concealed from Sentinel's customers and regulators.  The leveraging scheme involved the misuse of what were supposed to be customer assets to secure a loan to Sentinel from the Bank of New York.  That loan, in turn, financed the purchase of the risky securities from Defendants.

36.     The purchase of these securities was financed in two ways.  One was simply to draw the entire purchase price from Sentinel's loan with the Bank of New York, which was unlawfully secured by what were supposed to be segregated customer assets.  In many other instances, the purchase of securities was financed by the use of repurchase agreements under which Sentinel transferred the security purchased to a repo counterparty, such as Fimat or Cantor Fitzgerald, which loaned Sentinel a percentage of the price of the security (e.g., 90%) and took the security as collateral for the amount loaned.  The remainder of the purchase price was financed using Sentinel's loan with the Bank of New York.  Using repo agreements and the Bank

of New York loan, Mosley and other insiders were thus able to control billions of dollars of securities.

## DEFENDANTS' KNOWLEDGE OF THE UNSUITABILITY OF THE ESOTERIC SECURITIES FOR SENTINEL

37.     KBW and Cohen were at all relevant times broker-dealers registered with the SEC and members of the FINRA.   At all relevant times, defendants Rodriguez and Mohr were associated persons of KBW or Cohen, and at certain relevant times defendant de St. Phalle was an associated person of KBW.

38.     In those capacities, each of the defendants had an obligation pursuant to FINRA Rule 2310 to "know [their] customer" and to recommend only suitable securities to a customer based on the facts disclosed by the customer, including the customer's other securities holdings, financial situation and needs.   Both FINRA and the SEC have interpreted that rule to require, with respect to institutional customers, that a broker-dealer consider the customer's ability to evaluate the investment risk independently and the extent to which the customer is exercising independent judgment.

39.     Indeed, KBW's Operating Manual specifically provided that it was the KBW sales trader's responsibility to identify who the customer is and the source of the funds invested. Additionally, under KBW's own procedures the trader is required to recommend only suitable securities; have a reasonable basis for recommending securities transactions; and consider the customer's other securities holdings when making recommendations.   KBW's Operating Manual also makes it clear that the duty to recommend only suitable investments applies to institutional customers, and emphasizes the importance of the duty when the securities are complex, the customer has limited expertise of its own in the securities, and the customer does not have an

independent ability to evaluate the securities.  Finally, the manual explicitly provides that "Sales persons should act in the best interest of their clients."

40.     Based on materials on Sentinel's website, defendants' conversations with Mosley, Sentinel's financial statements, and publicly available materials, defendants knew, or should have known, about the segregated account structure and that Sentinel's guiding investment objective for customer portfolios was supposed to be "preservation of capital and liquidity in even the most turbulent of market conditions."  Defendants knew, or should have known, that Sentinel represented that its clients' assets were invested in U.S. Treasury obligations or other high quality, marketable securities issued by U.S. agencies, corporations and banks.  Sentinel's website explained that it invested client cash mostly in the overnight market, that it ensured that client cash was safe and liquid, and that Sentinel bought only the "highest quality and most liquid securities" unless specifically directed by a client to seek higher yield in somewhat lower quality issues.  However, Sentinel explicitly promised that it would not use derivatives, options or "any other 'financial engineering' techniques to enhance the yield on its portfolios.  Sentinel's objective [was] to achieve the highest yield consistent with preservation of principal and daily liquidity."

41.     At all relevant times prior to recommending the purchase of Esoteric Securities, defendants knew that the Esoteric Securities did not fit the investment profile for Sentinel's customers and were far too risky and illiquid for any of Sentinel's customer portfolios.  Indeed, in late 2005, a KBW managing director warned Rodriguez, Mohr and de St. Phalle that the securities they had been selling Sentinel were unsuitable.  That warning could hardly have come as a surprise to any of them, especially de St. Phalle, who had helped create PreTSLs in the first place and knew their risks better than anyone.

13

42.     Defendants also knew or should have known that Sentinel's customers treated the money they placed with Sentinel as cash and had been promised daily liquidity.  Holding substantial amounts of illiquid securities for such customers is necessarily inconsistent with that investment profile.

43.     Defendants Rodriguez, Mohr, de St. Phalle, KBW and Cohen therefore knew that PreTSLs, Alescos, Tabernas, Kleros, and Regional Diversifieds, and especially the lower tiers of those offerings, were unsuitable investments for any of Sentinel's customer portfolios.

44.     In addition, defendants knew or should have known that the volume of these securities that they recommended and sold to Sentinel were unsuitable for Sentinel's proprietary portfolio because Sentinel had few or no assets with which to purchase these instruments. Indeed, defendants also knew or should have known that Sentinel was actually purchasing the Esoteric Securities with what were supposed to be customer funds.

45.     In particular, defendants regularly received information on all securities held in Sentinel's overall portfolio, including the volume of the Esoteric Securities and other illiquid CDOs held by Sentinel.  Defendants further had an obligation under FINRA know-your-customer rules to know Sentinel's financial resources. By March 1, 2006, Sentinel's non-customer accounts had total stated balances of $13 million.  On the same date, Sentinel controlled more than $185 million (face value)  in the Esoteric Securities.  By January 2, 2007, the non-customer accounts had stated balances of about $15 million, but Sentinel controlled $318 million in the Esoteric Securities.  Defendants therefore knew or should have known that the huge volume of the Esoteric Securities they sold to Sentinel could only have been purchased with funds belonging to Sentinel customers, which were supposed to be invested in accordance with the investment objectives of safety of principal and liquidity as described above.

46.     In addition, defendants knew that Mosley was incapable of independently evaluating the risk of these extremely complex investments and that he did not in fact exercise independent judgment in purchasing the Esoteric Securities they recommended to him.  Indeed, the very point of offering and providing Mosley with various things of value was to ensure that he did not exercise independent judgment.  Accordingly, defendants were not engaged in arms-length transactions with Mosley, and Mosley's knowledge cannot be imputed to Sentinel.

## DEFENDANTS' SCHEME TO SELL THE ESOTERIC SECURITIES TO SENTINEL THROUGH MISREPRESENTATIONS AND SUBORNING MOSLEY

47.     Despite its knowledge that the Esoteric Securities were unsuitable for Sentinel, defendants collectively recommended and sold to Sentinel Esoteric Securities with a total face value of about $470 million, some of which were later sold back by Sentinel to KBW or Cohen, often as part of transactions in which Sentinel purchased substantially similar securities. Defendants did so in order to generate huge income, profits and sales commissions.  Over time, defendants increasingly sold Esoteric Securities to Sentinel that were particularly unsuitable because they came from lower classes of the particular issues, which meant higher risk of loss to Sentinel.

48.     Mosley participated in this scheme and breached his duties to Sentinel for two primary reasons.  First, Mosley's compensation was based in part on trading profits he generated for the House account. "Profits" on trades in illiquid, high-risk securities were attributed to the House and thus increased his bonus.

49.     Second, Mosley was motivated in large part to engage in the scheme, and in particular to trade in unsuitable, illiquid and high-risk securities, because he was suborned and compromised by defendants.  Defendants unlawfully showered Mosley with things of value. The benefits provided to Mosley by various defendants included vacations, tickets to sporting

events, expensive meals, all-night drinking excursions, limousine rides, plane tickets, golf

outings, and the use of a house belonging to one the brokers, as is further explained in detail

below.  At times, defendant Rodriguez even provided personal checks to Mosley, supposedly to

"reimburse" him for expenditures.  Defendants provided this improper compensation to Mosley

in blatant violation of FINRA Rule 3060, which prohibited them from giving him anything of

value in excess of $100 per year in relation to either the business of KBW or Cohen or that of

Sentinel.

50.     Thus, part of defendants' scheme to sell these unsuitable instruments to Sentinel

was to compromise and suborn Mosley so that Mosley was unable to and in fact did not exercise

disinterested judgment in accepting their recommendations that Sentinel purchase the Esoteric

Securities offered to him by defendants.   These inducements went far beyond typical or

acceptable levels of client entertainment measured by the value of the gifts and favors offered,

the frequency of the offers, the proximity of the offers to sales, the implicit quid pro quo nature

of this entertainment, and the extent of the debauchery involved in many of the events.   On

information and belief, defendants provided Mosley with things of value worth thousands of

dollars annually.  By no later than June 2005, defendants KBW, Mohr, Rodriguez, and de St.

Phalle had succeeded in suborning Mosley with such things of value and influenced Mosley in

connection with all purchases of  CDOs from KBW and Cohen following that date.

51.     Mosley did not in fact exercise independent and disinterested judgment in

purchasing securities recommended by the defendants, as defendants well knew.  In fact,

defendants sometimes joked about Mosley's malleability and how they compromised his

judgment.   In one email, de St. Phalle advised Rodriguez:   "WE NEED ANOTHER

CHARLES…….SERIOUSLY."   In another, de St. Phalle explained to a KBW colleague with

16

respect to another potential client:  "[T]his could be huge for us.  The head guy we saw in London [      ]. We were out w/him every night so he's driving the process………maybe another Charles!"

52.     It was further part of defendants' scheme that they recommended and sold securities to Sentinel and failed to disclose to Sentinel that the securities they were recommending were unsuitable for any of Sentinel's portfolios.

53.     It also was part of defendants' scheme that they recommended and sold the Esoteric Securities to Sentinel by falsely representing to Mosley that they would and could provide liquidity for these securities and that they would always make a market in these instruments should Mosley wish to sell.

54.     For example, Rodriguez advised Mosley at various times:  "We support each and every deal we sell;" we "will always protect our sole deals;"  "since [the security is] ours we will protect [it];" "don't say there is no liquidity in these;" "talk about liquidity[ . . .] bank income notes have the liquidity of a govt bond;" "everything i put u into I will trade;"  "we support what we sell to our clients." Mohr told Mosley:  "we'll always be there to trade the secondary [market] stuff," and "you'll have that source of liquidity there [with Cohen]."

55.     These representations were made by defendants knowing that they were false. Because the secondary market for these instruments was limited, Sentinel's ability to extricate itself from these risky positions depended on defendants' willingness to buy them back and to make a market in these securities.  Because defendants had limited capital and resources, defendants knew that they had no way to repurchase all the instruments they sold Sentinel and defendants had no basis for believing they could re-market all the Esoteric Securities they sold

Sentinel to third parties, particularly within a time frame that could match Sentinel's liquidity promise to its customers.

56.     Although offering memoranda were presumably prepared in connection with the initial issuance of the Esoteric Securities, in many cases such memoranda were not provided to Mosley prior to Sentinel's purchase of such securities and in some instances were not provided at all.  Moreover, any disclaimers in such memoranda would have been ineffective to counteract the misrepresentations made to Mosley because:  (a)  Mosley, who would have received such memos, was suborned by the things of value provided to him; (b) Mosley did not have the capacity to understand the risks of these securities or any disclosures concerning the securities; (c) defendants had an affirmative duty not to recommend the purchase of securities that they knew to be unsuitable, notwithstanding disclaimers.

57.     Defendants also recommended and sold the Esoteric Securities to Sentinel by providing Mosley with ratings information on the securities that they knew was misleading. At various times in the course of selling Esoteric Securities to Sentinel, defendants advised Mosley that the rating established for such instruments corresponded to the same rating for an ordinary corporate security, indicating, for example that a PreTSL note rated "A" carried the same risk as a corporate bond rated "A."  In fact, as defendants knew or should have known, the ratings on many of the Esoteric Securities were not comparable to those for corporate bonds because, among other things, these ratings were qualified.  Thus, defendants misled Mosley to believe that many of the securities he purchased were "investment grade" or a particular investment grade (such as "BBB") when they were not.

58.     Another part of defendants' scheme was to repurchase Esoteric Securities that they had sold to Mosley, which would free up cash for Mosley to purchase even more unsuitable

instruments from them, in turn generating more income for defendants.  In addition to improperly generating income and commission on these trades, defendants used this pattern of excessive trading to persuade Mosley that defendants would and could provide liquidity for these instruments.

59.     When defendants repurchased securities from Mosley as part of the scheme, they structured the transactions to ensure that Mosley was able to book a "profit" on the sale, generally for the Sentinel's "House" portfolio, which in turn generated inflated bonuses for Mosley.

**KBW BEGINS RECOMMENDING AND SELLING ESOTERIC SECURITIES**

60.     In early 2004, at the very outset of her relationship with Sentinel, Rodriguez told Mosley that the reasons for buying secondary market PreTSLs included better liquidity than competitors' deals and that KBW would "support each and every deal we sell," that is, that KBW would make a market in anything it sold Sentinel.

61.     On March 1, 2004, a KBW executive inquired of Rodriguez whether a certain security could be sold to Sentinel.  Rodriguez replied that it was not rated but "I AM PUSHING HIM TO TAKE A FLYER."

62.     In March 2004 defendant Rodriguez began a pattern of offering Mosley benefits and things of value.  Rodriguez learned early on that Mosley was an avid sports fan.

63.     On March 29, 2004, Rodriguez offered to take Mosley and his boss to the New York Yankees home opening game.

64.     Three weeks later, on April 19, Rodriguez offered Mosley a ticket to a luxury suite for a game between the Boston Red Sox and the New York Yankees.

65.     Two days after that, on April 21, Rodriguez offered to take Mosley to a luxury box for either Chicago White Sox or Chicago Cubs baseball games.

66.     Less than a week after that, on April 27, Rodriguez forwarded to Mosley schedules for both the New York Yankees and the New York Mets and asked him which games he would like to attend.

67.     On May 5, Rodriguez reiterated her earlier offer to host Mosley at a luxury box for either a Cubs or White Sox game.  Mosley accepted and Rodriguez sent him tickets for the game.

68.     The next day, May 6, 2004, Rodriguez sold Sentinel PreTSL class B1 notes, with a total face value of $3 million, and PreTSL class C notes with a total face value of $2 million, for settlement on May 12, generating substantial income for herself and KBW.

69.     On May 10, 2004, Rodriguez sold Sentinel a PreTSL class A1 note with a face value of $4 million, for settlement on May 12, generating substantial income for herself and KBW.  On the same date, Rodriguez offered Mosley an invitation to a conference that included dinner at the Ritz Carlton and entertainment.

70.     On June 4, 2004, Rodriguez offered Mosley tickets to the U.S. Open tennis tournament in Flushing Meadows, New York.

71.     On June 9, 2004, Rodriguez offered Mosley tickets for himself and other Sentinel employees to attend a Chicago Cubs baseball game at a rooftop party adjacent to Wrigley Field.  On the same date, Rodriguez sold Sentinel $5 million face value in PreTSL class B3 notes, for settlement on June 14, generating substantial income for herself and KBW.  Within about two weeks of the settlement date, KBW had repurchased those securities from Sentinel as part of the scheme to generate inflated and improper commissions and income for the KBW defendants.

72.     The following day, June 10, Rodriguez sold Sentinel another $10 million (face value) in PreTSL class A2 notes, for settlement on June 17, generating substantial income for herself and KBW.

73.     On June 18, 2004, Rodriguez offered Mosley a trip to New York for a golf outing to be held in Purchase, New York.

74.     On July 22, 2004,  Rodriguez sold Sentinel another $5 million (face value) PreTSL class B1 note, for settlement on July 27, generating substantial income for herself and KBW.

75.     On August 11, 2004, Rodriguez hosted Mosley and others from Sentinel at the rooftop party for the Cubs game.

76.     On September 10, 2004, Rodriguez offered Mosley eight tickets to a KBW outing at a football game between Northwestern University and Ohio State University to take place on October 2.

77.     Three days later, on September 13, Rodriguez sold Sentinel another $10 million (face value) in PreTSL class A2 notes, and $9.5 million face value in PreTSL class C notes, for settlement on September 20, generating substantial income for herself and KBW.

78.     On September 28, defendant Mohr emailed Rodriguez details of the party which Mosley was going to attend prior to the Northwestern football game, which Rodriguez then forwarded to Mosley.

79.     On October 5, 2004, Rodriguez sold Sentinel another $6 million (face value) PreTSL class A1 note, for settlement on October 8, generating substantial income for herself and KBW.

21

80.     On October 12, 2004, Rodriguez offered Mosley tickets for baseball games in New York and Boston.

81.     On October 20, Rodriguez invited Mosley and his boss to KBW's "Puerto Rico Field Trip" in December.  She offered to pay for their rooms at the Ritz Carlton and golf.

82.     As of November 24, 2004, Rodriguez and KBW had sold Sentinel a total of more than $54 million (face value) in PreTSLs.  However, by that date the KBW defendants had also repurchased from Sentinel all but $15.5 million of those instruments.  The KBW defendants engaged in these unnecessary trades to generate improper commissions and to convince Mosley that they would and could make a market in these instruments.

83.     Rodriguez and KBW continued selling Sentinel PreTSLs and then repurchasing them.  On November 29, 2004,  Rodriguez sold Sentinel $6.2 million (face value) PreTSL class D note, for settlement on December 2, generating substantial income for herself and KBW.  This was the first class D note she had sold Sentinel.

84.     On December 9, 2004,  Rodriguez sold Sentinel another $16.7 million (face value) in PreTSL notes ranging between classes A1 and B, for settlement on December 15, generating substantial income for herself and KBW.

**THE SCHEME CONTINUES IN 2005**

85.     On January 31, 2005, Rodriguez offered Mosley tickets to a baseball game in New York between the New York Yankees and the Chicago Cubs and said that she would attempt to obtain a luxury box.

86.     On February 4, 2005, Rodriguez sold Sentinel another $3 million (face value) PreTSL class D note, for settlement on February 9, generating substantial income for herself and KBW.

87.     On March 8, there was further exchange of correspondence between Rodriguez and Mosley about how many people from Sentinel could fit in the luxury box at Yankee Stadium for the Cubs game there.

88.     Two days later, on March 10, 2005, Rodriguez sold Sentinel $10 million in PreTSL class A1 notes, $2.5 million in class B notes, and $2.7 million in class D notes (all face values), for settlement on March 17, generating substantial income for herself and KBW.

89.     On April 5, 2005, Rodriguez took Mosley and his boss to an expensive dinner in Chicago.

90.     On April 8, 2005, Rodriguez repurchased from Sentinel the $10 million (face value) PreTSL 17 security she had sold Mosley less than one month earlier.

91.     On April 12, 2005, Rodriguez and KBW repurchased from Sentinel the $2.5 million (face value) PreTSL security she had sold Sentinel on March 10.  Also on April 12, she sold Sentinel an Alesco 7A class C note with a face value of $3 million, generating substantial income for herself and KBW.  She then caused KBW to repurchase that Alesco note from Sentinel on May 19.

92.     On June 2, Rodriguez and KBW repurchased from Sentinel the $3 million PreTSL note they had sold Sentinel on February 4.

93.     On June 7, Rodriguez sold Sentinel a $2.5 million (face value) PreTSL 18 class C note, for settlement June 15, generating substantial income for herself and KBW.  Later that day, Rodriguez and KBW paid for various Sentinel employees, including Mosley, to travel by limousine from Sentinel's office in Northbrook to downtown Chicago for a meeting and then took them to the Nine Steakhouse for a dinner paid for by KBW.

94.     On or about June 9, 2005, Rodriguez sold Sentinel $9.5 million (face value) in PreTSL 18 class B notes, for settlement June 15, generating substantial income for herself and KBW. She also sold Sentinel a $5 million PreTSL 18 class D note at par, that is, a price of 100.00.  Within a day or less, Rodriguez and KBW repurchased that same $5 million PreTSL 18 class D note from Sentinel at a price of 100.25, creating an artifical profit for Sentinel's books.

95.     Also on June 9, Rodriguez invited certain Sentinel employees to a golf outing to take place at the exclusive Winged Foot Golf Club in New York that has hosted the U.S. Open.

96.     The June 2005 sales by KBW described above were also part of the scheme to artificially generate inflated commissions and income for Rodriguez and KBW.  In fact, of the $12 million in securities KBW sold to Sentinel for settlement on June 15, all but $2 million were repurchased by KBW within eight days thereafter.

97.     On June 9, 2005, Chris O'Brien at KBW received an email from KBW colleagues that explained that Jacques de St. Phalle was going to begin putting Sentinel into securities that were even more unsuitable, less liquid and riskier than those they had sold to date:  "We are going to get Charles into income notes. . . ."

98.     Defendants quickly made good on their promise.  For example, on June 16, 2005, Rodriguez sold Sentinel a $1 million (face value) PreTSL 12 income note, for settlement on June 21, generating substantial income for Rodriguez and KBW.  That income note was unrated by any rating agency and was a physical security, making it both riskier and more difficult to trade than even the other securities the KBW defendants had previously sold Sentinel.

99.     On June 17, 2005, Rodriguez and KBW took Mosley and others from Sentinel to Tao, an expensive Asian restaurant in New York City.

100.    On June 18, 2005, defendants Rodriguez, Mohr, de St. Phalle and KBW hosted Mosley, his wife and others from Sentinel at an event at Yankee Stadium in New York for a game between the Yankees and the Cubs.

101.    On June 21, 2005, Rodriguez sold Sentinel a $1 million (face value) PreTSL 4 income note, and a $1 million (face value) PreTSL 18 income note, both for settlement on June 24, generating substantial income for Rodriguez and KBW.

102.    On June 22, Rodriguez and KBW repurchased from Mosley about half of the PreTSL 18 class B note they had sold him on June 9.

103.    On June 23, Mohr and KBW repurchased from Mosley the PreTSL 18 class C note they had sold him on June 7 and another portion of the PreTSL 18 class B note they had sold him on June 9.  They repurchased the remainder of the latter note from Mosley on July 11.

104.    On July 21 and July 25, 2005, Rodriguez again offered Mosley the opportunity to attend the golf outing at the Winged Foot country club and to attend a party in Central Park. Mohr offered to take Mosley to dinner after the golf outing.

105.    Also on July 25, Rodriguez and Mohr offered Mosley expensive "pit" tickets to see the band Coldplay play in concert in East Troy, Wisconsin on August 13.  The KBW defendants provided Mosley with tickets for himself, his wife and two others, and also arranged a limousine ride (Illinois to Wisconsin and back to Illinois) for Mosley.

106.    On various occasions in August 2005, Rodriguez offered to take Mosley and other Sentinel employees out to dinner.

107.    On August 11, 2005, Rodriguez sold Sentinel a $1 million PreTSL 7 income note, for settlement on August 16, generating substantial income for Rodriguez and KBW.

108.    On August 23, 2005, de St. Phalle and a colleague discussed plans for an upcoming trip to Chicago the following week.  De St. Phalle explained that they were "GOIN TO DINNER W/CHARLES THEN RUSH STR.  MY MAN LIKES TO GO OUT!"

109.    On August 29, KBW purchased from Mosley $10.7 million in PreTSL notes, $2.7 million of which they had sold Mosley on March 10.  That evening Rodriguez and de St. Phalle took Mosley to dinner and then, in Rodriguez's words, "on to rush street!!!!"

110.    On or about September 9, 2005, Rodriguez sold Sentinel various PreTSL notes from issues 19 and 14, ranging from class A1 to income notes, with a total face value of $42.85 million, for settlement on September 15, generating substantial income for Rodriguez and KBW.

111.    One of the securities involved in the September 9 sale was a $4.75 million (face value) PreTSL 19 class D note.  Rodriguez and KBW sold that note to Sentinel at par on September 9 and then repurchased the same note from Sentinel in a trade time-stamped one minute later at a premium to par creating a phony $6,000 profit for the House account.

112.    On September 13, Rodriguez offered tickets to Mosley and others at Sentinel for a Big 10 conference football game.  On the same date, Rodriguez sold Sentinel a $1 million (face value) Alesco 8 class D1 note for settlement September 20, generating substantial income for Rodriguez and KBW.

113.    On September 15, Rodriguez bought back from Sentinel the PreTSL $1 million income note she had sold Sentinel on June 16.  Also on September 15, Rodriguez sold Sentinel a $1 million (face value) PreTSL 8 income note, for settlement September 19, generating substantial income for Rodriguez and KBW.

114.    On September 29, 2005, Rodriguez sold Sentinel a $1 million (face value) PreTSL 13 class A3 note, for settlement on October 4, generating substantial income for Rodriguez and KBW.

115.    On October 11 and 12, de St. Phalle and Rodriguez extended to Mosley an invitation to KBW's Big 10 football outing at Northwestern, which included a pre-game party with dinner and drinks at an upscale art gallery.  Also on October 12, Rodriguez sold Sentinel a $1 million (face value) PreTSL 13 income note, for settlement on October 17, generating substantial income for Rodriguez and KBW.

116.    On October 13, Rodriguez sold Sentinel a $1 million PreTSL 18 income note and a $2.7 million PreTSL 4 income note, generating substantial income for Rodriguez and KBW.

117.    On October 14, 2005, Rodriguez offered Mosley six tickets to a concert performance.

118.    On October 18, 2005, Rodriguez sold Sentinel a $5.9 million PreTSL 10 income note, for settlement October 24, generating substantial income for Rodriguez and KBW.

119.    On October 20, 2005, Rodriguez sold Sentinel a $250,000 (face value) PreTSL 10 income note, for settlement October 25, generating substantial income for Rodriguez and KBW.

120.    On October 28, 2005, de St. Phalle flew to Chicago to take Mosley out to dinner and for a party in advance of the following day's football event.

121.    On October 29, Mosley attended the Big 10 football event with de St. Phalle and Rodriguez.

122.    On December 5, 2005, Rodriguez sold Sentinel an Alesco 9 class D1 note with a face value of $4 million, for settlement December 15, generating substantial income for Rodriguez and KBW.

123.     On December 9, 2005, Rodriguez sold Sentinel $25.5 million (face value) in PreTSL 13 and 20 notes ranging from class A4 to D and combo notes, for settlement on December 14 or 15, generating substantial income for Rodriguez and KBW.  On the same date, Rodriguez sent an email to Mosley communicating the arrangements that had been made for him to attend the Orange Bowl game in Miami, Florida courtesy of KBW.

124.     In about December 2005, a managing director and head of the fixed income department at KBW confronted Mohr, Rodriguez and de St. Phalle about their sales of PreTSLs and Alescos to Sentinel.  This managing director questioned whether Mosley and Sentinel understood what they were buying and asked in whose accounts they were putting these securities.  In fact, the managing director had Mohr pull up Sentinel's website and said "'Let's look through all the portfolios, where in the world are they putting all these yieldy credits?  Do they know what they're doing?"  The managing director in substance wanted to probe the depth of Mosley's understanding of the securities he was purchasing and indicated that there was no portfolio for which these high-yield, high-risk securities would be suitable.

125.     All told, for the securities Rodriguez sold to Sentinel in 2005, including PreTSLs and Alescos, she earned $2.2 million in sales credits.

### SALES OF ESOTERIC SECURITIES IN EARLY 2006

126.     In December 2005, de St. Phalle invited Mosley to Florida for the Orange Bowl football game.  Mosley then asked for a second ticket to the KBW box.  When de St. Phalle requested the second ticket from KBW administrative personnel, he was told that the tickets were all gone.  De St. Phalle replied:  "CHARLES IS PRIORITY #1 ACCOUNT OF OUR GROUP[.]  DON'T MESS W/ME."  KBW in fact came up with the second ticket.

127.     In early January 2006, de St. Phalle, Mohr, Rodriguez and KBW entertained Mosley and his friend at the Orange Bowl football game in Miami in a luxury skybox.  De St. Phalle also had Mosley stay as a guest at his vacation home in the exclusive Deering Bay gated waterfront golf and marina community in Coral Gables, Florida.  KBW and/or the individual defendants also picked up all of Mosley's entertainment and other expenses, including limousine transport to and from the game, while he was in Florida.  On information and belief, KBW or Rodriguez also paid for Mosley's airplane ticket to and from Florida.

128.     On January 3, 2006, on the way back to de St. Phalle's Florida house after the Orange Bowl, de St. Phalle took Mosley to a strip club.  Once at the club, de St. Phalle paid a "stripper" hundreds of dollars to take Mosley to a private room and perform several "lap dances" on him.

129.     On January 24, 2006, Rodriguez and KBW repurchased from Mosley a $5 million PreTSL combo note they had sold him on December 9.

130.     Despite the warnings that had been delivered in December 2005 about selling high-yield securities to Sentinel, on about January 25, 2006, Rodriguez and KBW sold Sentinel an unrated, physical $1.5 million (face value) PreTSL7 income note, which had an estimated yield of 18.55%, for settlement on January 30, generating substantial income for Rodriguez and KBW.  On the same date, Rodriguez and KBW repurchased a $1 million PreTSL 8 income note they had previously sold Mosley on September 15, 2005.

131.     On January 26, 2006, Mohr and KBW purchased from Sentinel $2 million of PreTSL 20 class D note.

132.     On February 13, 2006, Rodriguez sold Sentinel a PreTSL class D note, with a face value of $3.15 million, for settlement on February 16, generating substantial income for

Rodriguez and KBW. This was the same security involved in the January 26 transaction, and Mosley repurchased this amount of that security at the same unit price he had sold the $2 million piece at on January 26.

133.     In January or February 2006, de St. Phalle left KBW and went to work at another brokerage firm.

134.     On February 14, Mohr offered to take Mosley and others from Sentinel to dinner the following week.

135.     On February 16, Chris O'Brien requested of an associate at KBW that she obtain six tickets for Mosley for the Big East basketball tournament in New York in early March. O'Brien explained that "This is for the best client of the department."

136.     On or about February 17, 2006, Rodriguez sold Sentinel PreTSL 21 notes with a total face value of $33 million, almost half of which were class D, for settlement on March 1, generating substantial income for Rodriguez and KBW.  Also on February 17, 2006, Rodriguez discussed taking Mosley and other Sentinel employees to dinner the following week.

137.     On February 22, 2006, Ed O'Brien, the executive vice-president of KBW,  Mohr and Rodriguez took Mosley and others from Sentinel to Charlie Trotter's, a five-star restaurant in Chicago that is generally recognized as being one of the finest (and most expensive) restaurants in the United States.

138.      The following day, Ed O'Brien offered Mosley tickets to the Big East conference basketball tournament.   In addition, Chris O'Brien, another KBW employee, followed up and reiterated the offer.

139.     On February 24, 2006, Rodriguez offered to sell Sentinel PreTSL income notes. Mosley explained that if he were to be able to buy such notes, "I'd have to do it on swap because

our money's tight.  I can't repo those out."  Rodriguez responded by saying, "Let me see if we can get you out of any of the others and into these."  This again was part of Rodriguez and KBW's strategy to generate inflated income and commissions by buying Esoteric Securities from Sentinel, often securities which they had sold to Sentinel, and then selling Sentinel another similar Esoteric Security.  On the same day, Rodriguez sold Sentinel a PreTSL 3 note, this one with a face value of $3 million, for settlement on March 1, generating substantial income for Rodriguez and KBW.

140.    On February 28, 2006, Rodriguez sold Sentinel a PreTSL class D note with a face value of $6.3 million, for settlement on March 3, 2006, generating substantial income for Rodriguez and KBW.

141.    On March 6, 2006, Mohr had a phone conversation with Mosley in which Mohr suggested that he might be able to take Mosley to see the band Coldplay in Chicago the following month.

## KBW SCHEMES TO PARK ODYSSEY SECURITIES AT SENTINEL

142.    On March 7, 2006, Ed O'Brien and Chris O'Brien of KBW contacted Mosley to once again invite him to KBW's Big East Tournament party on March 23.  Ed O'Brien then turned the conversation to an unlawful scheme to temporarily remove certain securities from the books of KBW and asked for a "favor" from Mosley.  Specifically, Ed O'Brien explained that they were in "a little bit of a bind" and that they had a $30 million security issued by a company known as Odyssey Re, which they needed someone to "purchase" at a discount and hold for them until March 15, because they could not "hold it on our balance sheet."

143.    On March 7 or 8, 2006, Chris O'Brien and KBW in fact sold a $30 million (face value) Odyssey Re note to Sentinel in an explicit round-trip transaction.  On March 31,

Rodriguez and KBW repurchased the same note from Sentinel for a carrying charge plus a small profit. The sole purpose of this transaction was to unlawfully remove the security from KBW's balance sheet for a short period of time. Mosley was willing to engage in this transaction as a result of the improper gifts and benefits he had received from KBW and its agents, despite the fact that accepting a security which Sentinel had no interest in buying represented a blatant breach of his fiduciary duty to Sentinel.

### THE REMAINING KBW TRANSACTIONS

144.    On March 14, 2006, Rodriguez and Chris O'Brien had a telephone call with Mosley in which they discussed KBW purchasing from Mosley PreTSLs Sentinel already owned, and Mosley buying new PreTSLs from KBW.   Selling newly issued PreTSLs generated large up-front sales commissions. O'Brien told Mosley that KBW had sold "bank income notes" to Sentinel because KBW had "the unique ability in this space to trade them.  And we think they're a great investment.  A lot of the more senior people here own them.  We are generally the best bid on these things."

145.    Later the same day, Mohr had a conversation with Mosley about PreTSL income notes during which Mohr said that when it came time for Sentinel to sell them, KBW would always make a bid and "will always be there for you on this product."

146.    On March 16, 2006, Rodriguez sold Sentinel a $1 million (face value) PreTSL 4 note, for settlement on March 21, generating substantial income for herself and KBW.  On the same day, Rodriguez sent an email message to Mosley advising him as follows regarding the liquidity of certain income notes:  "talk about liquidity [ . . . ] bank income notes have the liquidity of a govt bond."

147.    On March 20, 2006, Rodriguez advised Mosley with respect to income notes:  "I will always bid what I sold u."

148.    On information and belief, KBW set up a trip for Mosley to New York for April 6 which included KBW paying for Mosley's hotel room.

149.    On March 22, Rodriguez and Mohr invited Mosley to join them for dinner in New York the following week.  Also on March 22, Chris O'Brien offered to take Mosley to a Cubs game in Chicago during April.

150.    On March 28, Rodriguez sold Sentinel a $2 million (face value) Alesco 10A class D note, for settlement on March 31, generating substantial income for herself and KBW.

151.    On March 30, Rodriguez sold Sentinel a $5 million (face value) Alesco 10A class C note, for settlement on April 4, generating substantial income for herself and KBW.

152.    In just the first quarter of 2006, Rodriguez's sale of PreTSLs, Alescos and similar unsuitable securities to Sentinel earned her sales credits of $672,458.

153.    In May 2006, defendants Rodriguez and Mohr left KBW and moved to Cohen. Following their departure, KBW continued offering Mosley entertainment and other things of value that were inappropriate both as a result of their nature and frequency.  Chris O'Brien offered to take Mosley and other Sentinel employees to dinner at Gibson's Steakhouse, which Mosley accepted.  That dinner took place on May 15.

154.    On June 8, 2006, salesman Robert Rogoz and others at KBW sold Sentinel $20 million (face value) in PreTSL 22 class C and D notes, for settlement June 15, generating substantial income for KBW.

155.    On August 8 and 11, Rogoz offered Mosley two tickets to a Cubs-Cardinals baseball game for August 18 and dinner afterwards.  When Mosley replied that he couldn't make the Cubs game, Rogoz invited him to a Chicago Bears football game.

156.    On September 11, 2006, Rogoz and KBW paid for Mosley to travel by limousine from his home in suburban Chicago to Green Bay, Wisconsin and back, a roundtrip of about 350 miles, for a Bears-Packers football game.  KBW also paid for Mosley's tickets for the game.

157.    Three days later, on September 14, 2006,  Rogoz and KBW sold Sentinel $19 million (face value) in PreTSL 23 notes, ranging from class A to D1, for settlement September 21, generating substantial income for KBW.

158.    In total, Rogoz made two sales to Sentinel and earned $337,500 sales credits on those transactions.

159.    Thereafter, a dispute arose between Sentinel and KBW over certain unsuitable securities that KBW had improperly sold to Sentinel, which Sentinel later re-sold to another party.  As it turned out, the shares were restricted and thus KBW was prohibited by law from having sold them in the first place.  The fight over KBW's mistake and who was going to take the loss associated with this sale of securities soured the relationship, and Mosley bought no more Esoteric Securities from KBW.

160.    KBW's conduct was part of a pattern, the full extent of which is unknown, but which reflects KBW's fraudulent intent with respect to benefits provided to Mosley.  For example, on various dates between September 12, 2006, and September 22, 2007, *The Columbus Dispatch* reported on allegations of violations of an Ohio state ethics law by a state employee who received certain benefits from Robert Rogoz of KBW.  The state official had executed more than $2.6 billion in trades with Rogoz or KBW and had received various benefits from Rogoz,

including a ticket to a Chicago Cubs game, attendance at the annual KBW Big 10 tailgate party, a meal at an upscale Chicago restaurant, transportation and other items.  The official pleaded guilty to a violation of the state ethics statute.

## RODRIGUEZ AND MOHR MOVE TO COHEN

161.    At all relevant times while they were employed by Cohen, Mohr and Rodriguez knew that the Esoteric Securities they offered and sold to Sentinel were unsuitable for Sentinel's customer portfolios, knew all of Sentinel's positions in Esoteric Securities, and knew that Sentinel itself did not have the resources to purchase the vast holdings of such securities controlled by Sentinel.

162.    Rodriguez and Mohr started at Cohen the first week of May 2006.

163.    On May 3, 2006, Rodriguez offered to take Mosley and other Sentinel personnel to dinner with top management from Cohen the following week.

164.    On May 8, 2006, defendant Mohr explained to Mosley that Cohen had pursued Mohr because of his success in promoting PreTSLs with the idea of parlaying that success into sales of other esoteric securities marketed by Cohen, including Alescos and Tabernas.  Also during this conversation, Mohr attempted to persuade Mosley to stop doing business with KBW and to begin doing business with Cohen, and falsely advised Mosley that Mohr had personally disrupted a plot by senior management at KBW to cause Sentinel to fire Mosley.   In fact, the supposed plot involved a managing director warning Mohr and Rodriguez that they should not be selling high-yield, risky securities to Sentinel.

165.    During this conversation, Mohr also advised Mosley that "from a liquidity side . . . I know all your positions.  I'd love to be able to work on all the stuff.  You'll have that source of liquidity there, you'll also have [the] Jacques [de St. Phalle] platform [at FTN], and they're

training me on how to trade the income notes." "If you were to give up the KBW relationship per se, you're not giving anything up in the sense that your PreTSLs will have a good source of liquidity from at least two spots, same thing with the income notes." Mohr added with respect to the secondary PreTSL market, "we'll always be there to trade the secondary stuff."

166. On May 9, Mohr and Rodriguez had a conversation with Mosley during which they tried to sell him on Alesco and Taberna securities. Rodriguez emphasized that they were going to make Alesco, Taberna and Cohen's other labels "as liquid as PreTSLs." Mohr and Rodriguez then repeated to Mosley the story about how KBW personnel had tried to get Mosley fired from his position at Sentinel.

167. Two days later, on May 11, 2006, defendants Rodriguez, Mohr and Cohen sold Sentinel a PreTSL 3 class B2 note, with a face value of $5 million, for settlement May 16, generating substantial income for themselves.

168. On the same date, as a further part of the scheme to generate improper income for themselves, Mohr and Rodriguez had a lengthy conversation with Mosley during which they encouraged him to trade out of PreTSLs which they had previously sold Sentinel and to purchase Tabernas instead. In an effort to assure Mosley about the "security" of these notes, Mohr advised Mosley that management at Cohen personally bought as many Taberna income notes as they could get. Mohr also explained that, by contrast, while they were at KBW, "there was always this big panic at the end if we didn't have all the income notes moved . . . .'who's going to take the income notes?' . . . It was like, 'Oh, my God!'" Notably, neither Mohr nor Rodriguez had ever explained to Mosley, while they were at KBW, that there was internal concern at KBW regarding the PreTSL income notes, including when they sold income notes to Mosley. Rodriguez also assured Mosley with respect to Tabernas: "You're not going to get hurt." On

information and belief, Mohr's statements that senior management at Cohen bought as many income notes as they could get was false.

169.    On May 31, 2006, Mohr and Rodriguez sold Sentinel $5 million (face value) in Regional Diversified income notes.  These were physical securities not registered with the Depositary Trust Corp. or any other electronic clearing system and were unrated.  The trade finally cleared on July 7, 2006, generating substantial income for Mohr, Rodriguez, and Cohen.

170.    On June 19, Rodriguez sold Sentinel Taberna class D and E notes, with a total face value of $12 million, for settlement on June 27, generating substantial income for herself and Cohen.

171.    On June 26, Rodriguez sold Sentinel an Alesco 11 class D note and an Alesco 11A class C note, with a total face value of $10 million, for settlement on June 29, generating substantial income for herself and Cohen.

172.    On about July 11, 2006, Rodriguez, Mohr and others from Cohen took Mosley to dinner at Pete Miller's Restaurant.  The purpose of the meeting, according to Rodriguez, was to establish "trust" in Cohen's new CDO products and to get Mosley comfortable with those products.  Rodriguez also told Mosley that Cohen wanted him "to know we support what we sell to our clients."  In other words, in order to persuade Mosley to purchase unsuitable securities, Rodriguez in substance said that Cohen would make a market in and repurchase those securities from Mosley if he needed to get out of those positions.

173.    On or about August 22, 2006, Rodriguez sold Sentinel a $5 million (face value) Alesco 10A class C note, for settlement on August 25, generating substantial income for Rodriguez and Cohen.

174.   On August 29, 2006, Rodriguez sold Sentinel a $1 million (face value) Alesco 10A class C note, for same-day settlement, generating substantial income for Rodriguez and Cohen.

175.   On August 31, Rodriguez offered Mosley tickets to the U.S. Open tennis tournament in Flushing Meadows, New York.

176.   On September 7, 2006, Rodriguez sold Sentinel a $1 million (face value) PreTSL 4 note for settlement on September 12, generating substantial income for Rodriguez and Cohen.

177.   In a conversation with Mosley on September 11, 2006, Rodriguez and another Cohen employee discussed various sales and swaps of securities, including Tabernas, Alescos PreTSLs, and Regional Diversifieds.   During that same conversation, Rodriguez finalized the sale to Sentinel of $8 million (face value) in Kleros 2006-3A combination notes (the lowest tranche of the Kleros issue) for settlement on September 26, generating substantial income for herself and Cohen.   Also during that same conversation, the Cohen employees also offered to give Mosley ties, suitcases and duffel bags; encouraged Mosley to let them know any types of events he would like to go to so that they could line it up; invited him to come to spend a weekend at a luxury hotel on the East Coast; and offered to pay to have lunch sent to Sentinel's entire office.

178.   Cohen and Rodriguez in fact bought lunch for Sentinel's entire office on September 18, 2006.

179.   On September 26, 2006, Mohr had a lengthy phone conversation with Mosley during which Mohr endeavored to persuade Mosley to purchase newly issued Alesco securities. In addition, Mohr sold Sentinel a $2 million (face value) PreTSL class B3 note, for settlement September 29, generating substantial income for himself and Cohen.

180.    On or before September 28, Rodriguez sold Sentinel a $12 million (face value) Taberna 2006-7A class C2 combo note, for settlement on September 28.  For this issuance, Class C2 was the lowest tier of the capital structure and thus had last priority for payment.  At the same time, Rodriguez also sold Sentinel a $5 million (face value) Taberna 2006-7A class A3L note (middle tier).  These transactions generated substantial income for Rodriguez and Cohen.

181.    On October 3, Rodriguez offered to get Mosley tickets for the next time the Chicago Bears played in New York.

182.    Also on October 3, defendant Rodriguez sold Sentinel another $5 million in Regional Diversified income notes--unrated, physical securities--for settlement on October 10, generating substantial income for Rodriguez and Cohen.

183.    On October 10, 2006, Cohen's chairman, Dan Cohen, Mohr, and another Cohen employee took Mosley to dinner at Pete Miller's Restaurant in Wheeling.  In an email to Mosley the following day, Mohr told Mosley:  "Doli and I will be back out there real soon and next time will finish the JW [Johnny Walker] blue [whiskey] with you."

184.    On or before October 12, 2006, Rodriguez sold Sentinel a $10 million (face value) Alesco 12A class C note and a $10 million (face value) Taberna 2006-7A class A3L note (middle tier), for settlement on October 12, generating substantial income for herself and Cohen.

185.    On October 16, Rodriguez offered Mosley tickets to see the Chicago Bears-New York Giants football game on November 12 or the Bears-New York Jets game on November 19, both of which were in New York.

186.    The Regional Diversified income notes that Cohen had sold to Sentinel in May and October 2006 were not only not investment grade, but unrated, which meant that Sentinel could not finance these securities through repo counterparties. Similarly, the Kleros combination

notes Sentinel had purchased in September 2006 were not accepted by repo counterparties.  In the latter part of 2006, defendants Cohen, Mohr and Rodriguez, and other high-level Cohen employees, participated in a scheme to "park" these notes with Cohen over the year end.

187.    On October 23, Mohr, Rodriguez and others at Cohen had a discussion with Mosley about parking the Kleros and Regional Diversifieds that Sentinel owned with Cohen over year-end and then Sentinel "buying" them back at the start of 2007.  The Cohen employees indicated that they would work on it.

188.    On October 30, 2006, Mohr and Rodriguez again discussed with Mosley the scheme to park Kleros and Regional Diversified securities with Cohen over the year-end. During this conversation, Mohr made crystal clear that there was no economic purpose to the transaction; indeed, they promised that Mosley would even receive the coupon payment for the Kleros which was scheduled to be made on January 2, a time during which Mosley would have already "sold" the security to Cohen.  As Mohr explained:  "what happens is that we get the distribution, and we would pass that along. . . ."  "So basically, you can sell bonds at X price. You're selling it higher and buying it back lower.  There's a distribution payment in there, which, I think we'd try to carry it for 4 weeks or so, and then we'd pass back some of that distribution, so for you, from a P&L perspective, it looks like you sold bonds for X, and you're buying them back, you know, at a lower dollar price, and the distribution is part of that."

189.    These discussions of sales and prearranged buy-backs reflected the fact that the relationship with Rodriguez, Mohr and Cohen was not arms length.

190.    On November 1, Rodriguez and Mohr took Mosley and a number of other Sentinel employees to dinner at Morton's Steakhouse.  Rodriguez and Cohen also hired a limousine to transport the Sentinel personnel to and from dinner.

191.    On November 3, 2006, Rodriguez offered to let Mosley use her vacation condo in Delray Beach, Florida.  She also offered to plan a tailgate party for Mosley and his friends for either the Giants or Jets football game.

192.    On November 13, Rodriguez advised Mosley that she had secured tickets for the New York Jets game on November 19.  She also informed Mosley that they were considering taking Mosley to the game in a helicopter after a brunch in New York City with various Cohen personnel.  Subsequently, Rodriguez was forced to change the planned helicopter transport to a limousine after she learned that the helicopter only held two people.

193.    On November 16, Mohr and Rodriguez sold Sentinel Alesco 13A class B and C notes with a total face value of $20 million, for settlement November 30, generating substantial income for themselves and Cohen.

194.    On November 19, Mosley attended the football game in New York as Cohen's guest.

195.    On December 6, 2006, Rodriguez and Mohr again spoke with Mosley about the scheme to park Kleros and Regional Diversified securities over year-end.  Mohr indicated that they would be able to take the Kleros securities over year-end.  However, they warned Mosley that they might not be able to hold the Regional Diversified notes over year-end because they were pure income notes.

196.    On December 8, 2006, Mosley was able to deliver the Kleros security to a Fimat, a repo counterparty, eliminating the need for Cohen to follow through with the plan to park that security over year end.

197.    On December 18, Rodriguez pitched lower tier Alesco 11 and Kleros 5 securities to Mosley's subordinate.  At that time she promised:  "everything i put u into I will trade."

198.    On December 21, Rodriguez and Cohen purchased lunch for the entire Sentinel office.  Rodriguez also offered Mosley the use of her Florida condo for a winter vacation.

199.    On December 22, 2006, defendants Mohr, Rodriguez and Cohen executed the scheme to park the Regional Diversified securities over year end.  Cohen "purchased" that security under a repo agreement which provided that Sentinel would deliver the securities to Cohen on December 27 and Cohen would return them on January 26, 2007.  In fact, on December 27, Cohen paid Sentinel $8 million for these securities, which had a par value of $10 million.  On January 29, 2007, Cohen "sold" the security back to Sentinel for $8 million.

200.    On January 3, 2007, Rodriguez invited Mosley to a party during a conference to take place in Las Vegas in late January.  On the same date, Rodriguez made yet another offer to Mosley to let him use her Florida condo in January or February.  On January 3 and 5, 2007, Rodriguez offered to take Mosley to dinner in Las Vegas.

201.    On January 16, 2007, Rodriguez again offered the use of her Florida condo to Mosley.

202.    On the following day, January 17, 2007, Rodriguez sold Sentinel a $6 million (face value) Alesco 12A class B note, for settlement on January 22, generating substantial income for herself and Cohen.  As part of the transaction, Sentinel sold a $5 million PreTSL 22 to Rodriguez.  In connection with that trade, Rodriguez explained her plan to "keep rolling u out those combos into new ones making u money.  have been doing that with a couple of accounts [. . .]  beneficial for everyone. . . keeps the flow going into new deals."  In substance, Rodriguez advised Mosley that by continually turning over Sentinel's portfolio Sentinel, Mosley and Rodriguez could all make artificial profits.

203.    On January 18, Rodriguez again offered Mosley the use of her Florida condo.

204.    On January 29, 2007, Mohr agreed to purchase <u>150 boxes</u> of Girl Scout cookies, with a value of $600, from Mosley's daughter.   On February 1, Rodriguez offered to buy additional Girl Scout cookies from Mosley's daughter.

205.    On February 1, 2007, Mohr and Rodriguez sold Sentinel a $3 million (face value) Alesco 12A class C note, for settlement on February 6, generating substantial income for themselves and Cohen.   This sale was part of a swap transaction in which Sentinel sold to Cohen a PreTSL security it had previously purchased from KBW.   During a phone call among Rodriguez, Mohr and Mosley, Rodriguez explained:   "PreTSL--I want you out of that."   Rodriguez did not comment on the irony of that statement given that she had personally put Sentinel <u>into</u> countless PreTSL transactions.   Rodriguez also informed Mosley that she was still serious about letting him use her condo.

206.    On February 9, Rodriguez offered Mosley the opportunity to attend a New York Rangers hockey game in a luxury suite.

207.    On February 12, 2007, Mohr and Rodriguez sold Sentinel a $7.29 million (face value) Taberna 2005-2 class E note, for settlement on February 15, as part of a swap for another security, generating substantial income for themselves and Cohen.   In a conversation prior to making the sale, Mohr advised Mosley that the equity tranche of this Taberna had been performing better than expected, and while there was great demand for this instrument, he wanted Mosley to have the first opportunity to buy it.   Rodriguez told Mosley that the collateral had "really been scrubbed, it's clean."   Despite these assurances, Sentinel sustained a total loss on this security.

208.     On February 14, Rodriguez sold Sentinel a $1 million (face value) Taberna 2005-3A class D note, for settlement on February 20, generating substantial income for herself and Cohen.

209.     On February 27, Rodriguez sold Sentinel a $7 million (face value) Taberna 2006-5A class A3FX note (lower tier of capital structure), for settlement on February 28, generating substantial income for herself and Cohen.

210.     On March 2, 2007, Rodriguez invited Mosley and others at Sentinel to a golf outing in Philadelphia to be held in May.   On information and belief, Rodriguez and Cohen offered to pay for hotel rooms for the trip at the Four Seasons Hotel.

211.     On March 14, Rodriguez sold Sentinel $10 million (face value) in Taberna 2007 class E notes, for settlement March 29, generating substantial income for herself and Cohen.

212.     On March 26, Rodriguez sold Sentinel $10 million (face value) in Alesco 15A class C notes, for settlement March 29, generating substantial income for herself and Cohen.

213.     On March 28, Mohr and Cohen paid for lunch for Sentinel's entire office from P.F. Chang's Restaurant.   Shortly after lunch, Mohr called Mosley to discuss Mosley purchasing even more Tabernas and Alescos.   Mohr convinced Sentinel to purchase these additional securities by telling Mosley that Mohr would "need" to buy back the securities for another planned CDO deal and that his sale was really just a function of the end of the quarter and Cohen needing to get these securities off its books temporarily.   Mohr then sold Sentinel a $2.388 million (face value) PreTSL 16 class A1 note, Taberna class C, E and combination notes (from issuances 2005-3A and 4A and 2006-7A) with a total face value of $9.5 million, and Alesco 10A and 12A class C notes with a total face value of $8 million, for settlement on April 2, generating

substantial income for himself and Cohen.  Despite Mohr's statements, Cohen later bought back only a small portion of the securities it had sold to Mosley on March 28.

214.    Between March 12 and April 3, 2007, alone, Sentinel's total long position in Esoteric Securities increased from $353.7 million to $418.1 million, due in significant part to sales of these securities by Rodriguez, Mohr and Cohen.

215.    On April 3, Mohr and Rodriguez called Mosley to propose more swap transactions.  They told Mosley that Taberna was "all clean paper. . . no problems. . . top of the line."  They also explained that Taberna had been spun off by Cohen and that the two companies had a tight relationship; in fact, as Rodriguez put it, "I mean, basically we own it."  Rodriguez then called back and offered to buy lunch for Sentinel's entire staff.  Mohr and Rodriguez ended up selling Mosley a $10 million (face value) Taberna 8A class A2 note, for settlement on April 9, as part of a swap transaction, generating substantial income for themselves and Cohen. Despite defendants' assurances, Sentinel suffered a nearly 100% loss on the Taberna note.

216.    On April 10, Rodriguez sold Sentinel another $5 million (face value) Taberna 2007-8A class A note, for settlement on April 17, generating substantial income for herself and Cohen.

217.    On or before April 11, Rodriguez sold Sentinel a $2 million (face value) Taberna 2007 class E note, for settlement on April 11, generating substantial income for herself and Cohen.

218.    On April 11, Rodriguez offered to buy Sentinel's employees lunch on April 13.

219.    On or before April 11, 2007, Rodriguez sold Sentinel a $5 million (face value) Alesco 11A combination note (the lowest tranche of Alesco 11A and one which carried no stated rate of interest), for settlement on April 11, generating substantial income for herself and Cohen.

45

220.    On April 18, Mohr contacted Mosley to discuss some possible swaps of PreTSL securities owned by Sentinel for Alesco and Tabernas.  At the same time offered to buy lunch -- "PF Changs or some steaks"--for Sentinel's office.  In fact, Mohr ended up buying lunch for Sentinel's office on April 19.

221.    On April 23, Rodriguez again paid for lunch for Sentinel's entire office, this time from Wildfire Restaurant.  She also again pushed the swaps Mohr had proposed on April 18.

222.    From May 6 to May 8, Mosley and one of his subordinates attended the golf outing to which Rodriguez had invited them in Philadelphia.  On information and belief, Cohen paid their expenses while on the trip.

223.    On May 9, Mohr again proposed a swap of PreTSLs for a Taberna 2 security with a face value of $5.7 million and advised Mosley that Cohen had provided very consistent liquidity for his Taberna and Alesco securities.

224.    On May 15, Rodriguez and Mohr in fact sold Sentinel the $5.7 million Taberna 2005-2A class C note, for settlement on May 18, generating substantial income for themselves and Cohen.  Cohen simultaneously purchased a $5 million PreTSL from Sentinel that Rodriguez and Mohr had previously sold Sentinel when they worked for KBW.

225.    On May 30, Rodriguez invited Mosley to a dinner at a conference in Barcelona, Spain.

226.    On June 14, 2007, Rodriguez sold Sentinel a $10 million (face value) Kleros 2007-8A class A3 note, for settlement on June 26, generating substantial income for herself and Cohen.

227.    On June 15, 2007, Rodriguez proposed by email that Mosley purchase an $8 million (face value) Alesco 16 note and that in return Cohen would buy from Sentinel the $1

million Alesco 12 note that Cohen had sold Mosley on February 1 and the $5 million Alesco 15 note that they had sold Mosley on March 26.  Rodriguez then sent another email telling Mosley if he opened up the prior email setting out the proposed trade, he would get lunch at his favorite restaurant the following Monday.

228.    In fact, on Monday, June 18, Rodriguez and Cohen bought Sentinel's entire office lunch at Wildfire Restaurant.

### THE REPO COUNTERPARTIES' RETURN OF SECURITIES TO SENTINEL

229.    Many of the Esoteric Securities that Sentinel had purchased from defendants and another broker were delivered to counterparties like Fimat under a repo agreement.  Fimat and other counterparties provided funds to Sentinel against the securities, but under "overnight" agreements that allowed them to refuse to continue the financing and return the securities to Sentinel at any time.

230.    During the last week in June 2007, Fimat refused to continue financing approximately $147 million in PreTSL and Kleros combination notes transferred to Fimat under the repo agreements, and returned those securities to Sentinel.  The return of those securities obliged Sentinel to come up with cash to repurchase them, which it was only able to do by drawing further on its loan with the Bank of New York or selling those or other securities.

231.    Mosley then desperately tried to sell some of the Esoteric Securities in order to reduce the bank loan which was being used to finance them.   On about June 26, Mosley tried to sell some of the Taberna notes he had purchased from defendants Cohen, Mohr and Rodriguez in the market.  Mohr found out about Mosley's efforts when other brokers offered them to him and advised Mosley that it was a mistake for Mosley to have let anyone else know that Mosley wanted to sell Tabernas. Mohr also advised Mosley that Cohen would not be able to repurchase

Tabernas from Mosley for cash, but might be able to swap Tabernas that Sentinel owned for Alescos held by Cohen.  Mohr said that he hoped that they had proved to Mosley that Alescos had good liquidity.  Mosley said that he needed cash.

232.    On June 27, Rodriguez offered to buy tickets to any concerts that Mosley might be interested in attending.

233.    On or before June 28, Rodriguez in fact sold Sentinel the $8 million Alesco 16A class C note as part of a swap transaction, generating substantial income for herself and Cohen.

234.    On or before July 10, 2007, Rodriguez sold Sentinel another $2 million Alesco 16A class C note, for settlement on July 10, generating substantial income for herself and Cohen. On the same date, Rodriguez again offered Mosley concert tickets.

235.    On or about July 17, Rodriguez informed Mosley's assistant that Cohen would probably be buying Alesco paper as part of a new CDO deal they were preparing.

236.    On or about July 24, Rodriguez took Mosley to dinner.

237.    On dates that are presently unknown, Rodriguez provided Mosley with personal checks, the number and dollar amount of which is unknown, which the parties agreed to characterize as being for "reimbursement" of Mosley.

### SENTINEL'S COLLAPSE

238.    Sentinel's problems continued throughout July 2007, as repo counterparties continued to return illiquid securities sold to Sentinel by brokers, including defendants, which in turn required Sentinel to borrow more money from Bank of New York to fund the repurchases. This left Sentinel in a liquidity crisis and led to Sentinel's collapse.

239.   On Monday, August 13, 2007, in the face of customer attempts to redeem that Sentinel was unable to honor, Sentinel unilaterally halted customer redemptions.   Sentinel's failure received widespread press coverage.

240.   Also on August 13, 2007, Chris O'Brien of KBW send a purportedly humorous email to Robert Rogoz and others in which he asked:   "MAYBE I SHOULD FIND OUT IF CHARLES WOULD LIKE TO DOUBLE DOWN…"

241.   On Tuesday, August 14, 2007,  On the same date, Chris O'Brien of KBW cut and pasted a portion of Sentinel's website into an email, which he sent to Ed O'Brien of KBW.  The portion of the Sentinel website included in the email was a "frequently asked question":  "How can I be sure my money is safe at Sentinel?" and the answer to that question, including Sentinel's claim that client cash is "safe and liquid."  Ed O'Brien responded to Chris O'Brien with an email that said simply:  "no bears [-] packers this year"  (a reference to the limo trip to Green Bay and the football game to which they had treated Mosley in September 2006).

242.   On Friday, August 17, 2007, Sentinel filed for bankruptcy.

243.   On August 24, 2007, Robert Rogoz and Chris O'Brien of KBW engaged in a purportedly humorous exchange about their dealings with Charles Mosley, the Sentinel debacle, and their desire to distance themselves from Mosley.  Rogoz sent O'Brien an email asking if O'Brien was in Atlantic City with "Jacques and Charles."  O'Brien responded that he was in Las Vegas and joked that "Charles is paying for the whole thing."  When Rogoz facetiously asked "Charles who?"  O'Brien responded "Charles Barkley," to which Rogoz replied "I don't know that Charles either."

## HARM TO SENTINEL

244.    Defendants' recommendation and sale of unsuitable securities to Sentinel harmed Sentinel.  Sentinel owned these positions:  they were generally not reported on Sentinel's customer account statements at the time Sentinel purchased these securities and Sentinel bore the entire risk on these positions.  Sentinel's losses on these securities occurred because of the very facts which rendered them unsuitable in the first place and which were not disclosed to Sentinel.

245.    These positions did not benefit Sentinel at all; to the contrary, purchasing these securities immediately compromised Sentinel's ability to meet its obligations to creditors.

246.    As of the date it collapsed, Sentinel was holding or had repo'd to counterparties Esoteric Securities sold to Sentinel by KBW with a face value of approximately $14.8 million, at a cost basis of approximately $12.6 million.  The Trustee realized only $7.7 million from the sale or closeout of these positions by repo counterparties.  In total, Sentinel sustained a loss on the Esoteric Securities sold to Sentinel by KBW of approximately $4,919,568.

247.    As of the date it collapsed, Sentinel was holding or had repo'd to counterparties Esoteric Securities sold to Sentinel by Cohen with a face value of approximately $159.9 million, at a cost basis of approximately $159.2 million.  Some of those securities could not be sold by the Trustee at any price, and Sentinel suffered a 100% loss on those securities.  Others were sold at little more than 10% of their face value.  The rest were sold at a substantial loss.  In total, Sentinel sustained a loss on the Esoteric Securities sold to Sentinel by Cohen of approximately $94.7 million.

248.    None of Sentinel's former insiders will benefit from any recovery obtained in this action.

## COUNT ONE

**Aiding and Abetting/Knowing Participation in Mosley's Breach of Fiduciary Duty
(All Defendants)**

249.    Plaintiff restates and realleges paragraphs 1 through 248 of this Complaint as
though fully set forth herein.

250.    At all relevant times, Charles Mosley was an officer and director of Sentinel.

251.    As an officer and director, Mosley owed Sentinel a fiduciary duty of loyalty and a
fiduciary duty to act with due care and to deal honestly and fairly with Sentinel.  Mosley's
primary duty to Sentinel was to ensure that Sentinel was investing funds consistent with its
obligations to customers.

252.    Defendants knew of Mosley's fiduciary duties to Sentinel.

253.    Mosley breached his fiduciary duties to Sentinel by, among other things:  (a)
purchasing securities for Sentinel from defendants that were unsuitable for Sentinel and which
put Sentinel at undue risk; (b) purchasing risky and illiquid securities from defendants that were
inconsistent with Sentinel's requirements and representations concerning the types of securities
in which it would invest customer funds; (c) purchasing securities from defendants for the
improper purpose of generating income and profits for defendants when there was no legitimate
business purpose or benefit to Sentinel from doing so; (d) purchasing securities from defendants
for the purpose of improperly generating inflated bonuses for Mosley; (e) engaging in round-trip
transactions which had no economic purpose; (f) parking Odyssey Re securities on Sentinel's
balance sheet; (g) parking Sentinel securities with Cohen over year-end; (h) participating in a
massive leveraging scheme which, among other things, misused what were supposed to be
customer assets to collateralize a loan to Sentinel; (i) accepting valuable gifts, entertainment,
travel, sports tickets, vacations, and other benefits and things of value from defendants in

connection with his purchase of securities from defendants; and (j) subordinating his duties to Sentinel to his perceived obligations to defendants based on the benefits he received from them.

254.    Defendants knew of Mosley's breaches of fiduciary duty and knowingly induced, aided, abetted, participated in and benefited from those breaches.   In particular, defendants, among other things, knowingly:  (a) recommended and sold unsuitable securities to Sentinel to generate improper and inflated income and profits to themselves; (b) repurchased unsuitable securities from Sentinel and then sold Sentinel another similarly unsuitable security to generate improper and inflated income and profits for themselves; (c) sold securities to Sentinel when they knew or should have known that the purchase of those securities was funded by misusing assets that were supposed to belong to customers; (d) engaged in round-trip transactions that had no economic purpose; (e) parked bonds they had previously sold Sentinel over year-end; (f) induced Mosley to hold bonds for which Sentinel had no use in order to temporarily get them off Cohen's books; and (g) suborned and corrupted Mosley and improperly influenced his decision-making by offering and providing him with valuable gifts, entertainment travel, sports tickets, vacations and other improper benefits and things of value.

255.    Sentinel has been damaged as a result of defendants' participation in Mosley's breaches of fiduciary duty.

WHEREFORE, Plaintiff respectfully requests that the Court enter judgment in favor of Plaintiff and against all defendants for compensatory damages, plus punitive damages in an amount to be determined by the Court, interest, costs, and attorneys' fees, and grant such other relief as may be appropriate.

## COUNT TWO

### Commercial Bribery
### (All Defendants)

256.     Plaintiff restates and realleges paragraphs 1 through 255 of this Complaint as though fully set forth herein.

257.     Between May 2004 and April 2006, defendants Rodriguez, Mohr and KBW sold Sentinel hundreds of millions of dollars in securities.  In addition, KBW sold Sentinel additional securities between May and September 2006.

258.     Between April 2006 and July 2007, defendants Rodriguez, Mohr and Cohen sold Sentinel hundreds of millions of dollars in securities.

259.     Mosley was an employee, officer, agent and fiduciary of Sentinel, and as head trader was entrusted with the duty of purchasing securities for Sentinel and with ensuring that the securities he purchased satisfied Sentinel's obligations to its investors.

260.     Defendants conferred and offered to confer extensive benefits upon Charles Mosley, as described in detail above.

261.     Sentinel did not consent to and did not know of the extent, nature and frequency of the benefits being offered to or conferred on Mosley or of the fact that Mosley's independence was suborned by such those benefits.

262.     Defendants offered and conferred these benefits with intent to influence Mosley in the performance of his job, namely, to influence Mosley to buy securities from them on behalf of Sentinel.

263.     Offering and conferring these benefits on Mosley was part of a device, scheme and artifice to defraud Sentinel.  The practice of offering and conferring the benefits on Mosley operated to deceive Sentinel, which relied on Mosley's undivided loyalty and judgment in

purchasing securities from defendants.  Mosley was in fact suborned and unduly influenced by the benefits provided by defendants and thereby failed to faithfully execute his duties to Sentinel in connection with the purchase of securities.

264.    Sentinel was damaged as a result of its purchase of securities from defendants and defendants were unjustly enriched by the sales of those securities to Sentinel.

WHEREFORE, Plaintiff respectfully requests that the Court enter judgment in favor of Plaintiff and against defendants for rescission, disgorgement of the value of the bribes, disgorgement of all income, profits, commissions and compensation received by defendants on transactions with Sentinel, and compensatory damages, plus punitive damages in an amount to be determined by the Court, interest, costs, and attorneys' fees, and grant such other relief as may be appropriate.

## COUNT THREE

### Securities Fraud in Violation of 15 U.S.C. § 78j(b) and Rule 10(b)-5(a)-(c)
### (All Defendants)

265.    Plaintiff restates and realleges paragraphs 1 through 264 of this Complaint as though fully set forth herein.

266.    Between May 2004 and April 2006, defendants Rodriguez, Mohr and KBW sold Sentinel hundreds of millions of dollars in unsuitable Esoteric Securities.  In addition, KBW sold Sentinel additional unsuitable esoteric securities between May and September 2006.

267.    Between April 2006 and July 2007, defendants Rodriguez, Mohr and Cohen sold Sentinel hundreds of millions of dollars in unsuitable Esoteric Securities.

268.    These sales of securities were part of an unlawful scheme to defraud Sentinel, and this course of business operated as a fraud upon Sentinel.

269.    It was part of the defendants' fraud scheme to suborn and co-opt Mosley by offering and conveying things of value to him.  Sentinel did not consent to and did not know of the extent, nature and frequency of the benefits being offered to or conferred on Mosley or of the fact that Mosley's independence was suborned by such those benefits.

270.    Defendants acted with scienter in knowingly bribing and co-opting Mosley and in failing to disclose these offers and benefits to Sentinel.  Defendants acquired undue influence over Mosley as a result of the bribery.

271.    Defendants had a duty to disclose to Sentinel the full extent, nature and frequency of the offers and benefits by virtue of offering and/or paying the benefits and by virtue of the fact that they recommended the purchase of the securities to Mosley.

272.    Sentinel relied on Mosley's undivided loyalty and independent judgment in purchasing securities from defendants.

273.    It was further part of the scheme that defendants recommended and sold to Sentinel Esoteric Securities by means of various misrepresentations.

274.    Defendants acted with scienter by misrepresenting to Sentinel various facts, including that certain securities were investment grade, the ratings of these securities, their liquidity, and defendants' willingness and ability to make a market in those securities and other facts, intending that Sentinel rely on those misrepresentations.

275.    Among the misrepresented facts were representations that at least the following securities were "investment grade" when in truth the qualifications attached to the ratings on those securities rendered them not investment grade:

| Security | Notes Sentinel Purchased with Qualified Ratings |
|---|---|
| PreTSL 19 | Senior Notes (Class A) |

|  | Mezzanine Notes (Classes B, C, D) |
|---|---|
| PreTSL 20 | Senior Notes (Class A) |
|  | Mezzanine Notes (Classes B, C, D) |
|  | Combination Notes (XX-1, XX-3) |
| PreTSL 21 | Mezzanine Notes (Classes D) |
| PreTSL 22 | Mezzanine Notes (Classes C, D) |
|  | Combination XXII-4 Notes |
| PreTSL 23 | Class AX Notes |
|  | Senior Notes (Classes A-FP, A-1, A-2) |
|  | Mezzanine Notes (Classes B, C, D) |
| PreTSL 25 | Mezzanine Notes (Classes B, C, D) |
|  | Combination Notes (XXV-2) |
| TBRNA 2005-2 | Mezzanine Notes (Classes C, E) |
| TBRNA 2005-3 | Mezzanine Notes (Class D) |
| TBRNA 2006-7 | Senior Notes (Class A) |
|  | Combination Notes (Class C) |
| TBRNA 2007-8 | Class A Notes |
|  | Class E Notes |
| KLROS 2007-8 | Class A3 Notes |
| ALESC 8 | Class D1 Notes |
| ALESC 11 | Class C Notes |
|  | Class D Notes |
|  | Combination Notes |
| ALESC 13 | Class B Notes |
|  | Class C Notes |
| ALESC 15 | Class C Notes |
| ALESC 16 | Class C Notes |

276.    The facts misrepresented were material to the transactions.

277.    Sentinel was deceived by these misrepresentations and justifiably relied on defendants' recommendations in purchasing the above-described securities.

278.    It was further part of the scheme that defendants recommended and sold to Sentinel securities that they knew were unsuitable for Sentinel.

279.     Despite knowledge of their unsuitability, defendants recommended the unsuitable Esoteric Securities to Sentinel, intending that Sentinel rely on their recommendations.

280.     Defendants had a duty to disclose to Sentinel that the Esoteric Securities they sold to Sentinel were unsuitable for customer portfolios.  Such a duty arose by virtue of the FINRA know-your-customer rules and by virtue of the facts that defendants made recommendations to Sentinel to purchase the Esoteric Securities, defendants had bribed and co-opted Mosley, and defendants knew that Mosley was not exercising independent judgment in purchasing these securities but that Sentinel was relying on Mosley to exercise that independent judgment.   .

281.     Defendants breached their duty to disclose by failing to disclose to Sentinel that the Esoteric Securities they sold to Mosley were unsuitable for Sentinel.

282.     The suitability of the Esoteric Securities for Sentinel was material to the transactions.

283.     Sentinel relied on the facts known to it in purchasing the securities.

284.     Sentinel would not have purchased the securities had it known of the bribery of Mosley, the unsuitability of the securities, or the true facts concerning the securities.

285.     Sentinel was damaged as a result of defendants' scheme to defraud, misrepresentations and failures to disclose.  Sentinel purchased hundreds of millions of dollars in unsuitable securities in reliance on this misconduct.  Sentinel's losses were caused when the value of these securities declined because of the very facts which were misrepresented, omitted or which rendered these securities unsuitable.

WHEREFORE, Plaintiff respectfully requests that the Court enter judgment in favor of Plaintiff and against defendants for compensatory damages, plus punitive damages in an amount

to be determined by the Court, interest, costs, and attorneys' fees, and grant such other relief as may be appropriate.

## COUNT FOUR

**Violation of the Illinois Blue Sky Law**
**815 ILCS 5/12**
**(Defendants KBW, Rodriguez, Mohr and de St. Phalle)**

286.    Plaintiff restates and realleges paragraphs 1 through 285 of this Complaint as though fully set forth herein.

287.    Defendants failed to disclose to Sentinel material facts in connection with their sale of the following Esoteric Securities to Sentinel between 2004 and 2006, as described above:

| Settlement Date | Principal Amount | Description | CUSIP |
|---|---|---|---|
| 06/24/05 | $1,000,000 | PRETSL 4 | 74040VAB4/PP5I03B63 |
| 09/15/05 | $2,600,000 | PRETSL FLOAT | 74042HAC1 |
| 10/18/05 | $2,718,369 | PRETLS 4 | 74040VAB4/PP5I03B63 |
| 12/14/05 | $1,500,000 | PRETSL 3.76 | 74041AAD5 |
| 12/15/05 | $3,000,000 | PRETSL FLOAT | 74042DAE6 |
| 12/15/05 | $2,000,000 | PRETSL FLOAT | 74042DAE6 |
| 12/15/05 | $1,000,000 | PRETSL FLOAT | 74042DAG1 |
| 10/04/06 | $1,000,000 | PRETSL 2.99 | 74041AAC7 |

288.    Defendants' material omissions were made in connection with the sale of the Esoteric Securities listed in Paragraph 287 above and tended to work a fraud or deceit upon Sentinel.

289.    Defendants' material omissions regarding the Esoteric Securities transactions listed in Paragraph 287 above allowed defendants to obtain money and/or property from Sentinel through the fraudulent sale of the Esoteric Securities.

290.    Defendants' material omissions regarding the Esoteric Securities transactions listed in Paragraph 287 above were part of a device, scheme or artifice to defraud Sentinel in connection with the sale of the Esoteric Securities.

291.    Sentinel reasonably relied on defendants' false and misleading statements and omissions in purchasing these securities.

292.    Sentinel would not have purchased the securities absent defendants' false and misleading statements and omissions.

293.    Sentinel's losses were caused when the value of these securities declined because of the very facts which were misrepresented and omitted.

294.    The Trustee gave notice of its election to void and rescind the purchase of securities within six months after obtaining knowledge that the sale of the securities to Sentinel was voidable.

WHEREFORE, Plaintiff respectfully requests that the Court enter judgment in favor of Plaintiff and against defendants for rescission and for the full amount paid for the Esoteric Securities transactions listed in Paragraph 287 above, together with interest from the date of payment less any income or other amounts received by Sentinel on the securities and the amount received by Sentinel for or on account of the disposition of the securities.

## COUNT FIVE

### Violation of the Illinois Blue Sky Law
### 815 ILCS 5/12
### (Defendants Cohen, Rodriguez, and Mohr)

295.    Plaintiff restates and realleges paragraphs 1 through 294 of this Complaint as though fully set forth herein.

296.    Defendants failed to disclose to Sentinel material facts in connection with their sale of the following Esoteric Securities to Sentinel between May 2006 and July 2007, as described above:

| Settlement Date | Par Amount | Description | Identifier |
|---|---|---|---|
| 05/16/06 | 5,000,000 | PRETSL 4.775 | 44984SAD8 |
| 06/27/06 | 7,000,000 | TBRNA 2006-6A D1 | 87331AAG9 |
| 06/27/06 | 5,000,000 | TBRNA 2006-6A E1 | 87331AAJ3 |
| 06/29/06 | 5,000,000 | ALESC 11A C1 | 01450AAD2 |
| 07/07/06 | 5,000,000 | REG DIV | 75902YAA4/PP4DODG68 |
| 08/25/06 | 5,000,000 | ALESC 10A C1 | 01449WAD8 |
| 08/29/06 | 1,000,000 | ALESC 10A C1 | 01449WAD8 |
| 09/13/06 | 1,000,000 | PRETSL FLOAT | 74040TAC7 |
| 09/26/06 | 3,000,000 | KLROS 2006-3A COM | 49858UAA1 |
| 09/26/06 | 5,000,000 | KLROS 2006-3A COM | 49858UAA1 |
| 09/28/06 | 1,000,000 | TBRNA 7, 2006-7A C2 | 873314AD0 |
| 09/28/06 | 11,000,000 | TBRNA 7, 2006-7A C2 | 873314AD0 |
| 09/28/06 | 5,000,000 | TBRNA 2006-7 A A3L | 873315AE5 |
| 09/29/06 | 2,000,000 | PRETSL4.15 | 74040YAF9 |
| 10/12/06 | 5,000,000 | REG DIV | 75902YAA4/PP4DODG68 |
| 11/30/06 | 10,000,000 | ALESC 13A B | 014495AD7 |
| 11/30/06 | 5,000,000 | ALESC 13A B | 014495AD7 |
| 01/22/07 | 6,000,000 | ALESC 12A B | 01450DAD6 |
| 02/06/07 | 2,000,000 | ALESC 12A C1 | 01450DAE4 |
| 02/15/07 | 7,290,000 | TBRNA 2005-2A E1 | 87330UAK7 |
| 02/20/07 | 1,000,000 | TBRNA 2005-3A D | 87330WAJ6 |
| 02/28/07 | 7,000,000 | TBRNA 2006-5A | 87331BAG7 |

|  |  | A3FX |  |
|---|---|---|---|
| 03/29/07 | 5,000,000 | TBRNA 2007-8A E | 87331VAL2 |
| 04/02/07 | 3,000,000 | ALESC 10A C1 | 01449WAD8 |
| 04/02/07 | 2,388,000 | PRETSL FLOAT | 74041EAA3 |
| 04/02/07 | 2,500,000 | TBRNA 2005-3A C1 | 87330WAG2 |
| 04/02/07 | 3,500,000 | TBRNA 2005-4A C1 | 87330YAF0 |
| 04/02/07 | 3,500,000 | TBRNA 2006-7 A A3L | 873315AE5 |
| 04/09/07 | 10,000,000 | TBRNA 8 2007-8A A2 | 87331VAG3 |
| 04/12/07 | 5,000,000 | ALESC 11A COM | 01450AAJ9 |
| 04/17/07 | 5,000,000 | TBRNA 8 2007-8A A2 | 87331VAG3 |
| 05/18/07 | 5,700,000 | TBRNA 2005-2A C1 | 87330UAF8 |
| 06/26/07 | 10,000,000 | KLROS 2007-8A A3 | 49859EAD0 |
| 06/28/07 | 8,000,000 | ALESC 16A C | 01450GAC1 |
| 07/10/07 | 2,000,000 | ALESC 16A C | 01450GAC1 |

297.    Defendants' material omissions were made in connection with the sale of the Esoteric Securities listed in Paragraph 296 above and tended to work a fraud or deceit upon Sentinel.

298.    Defendants' material omissions regarding the Esoteric Securities transactions listed in Paragraph 296 above allowed defendants to obtain money and/or property from Sentinel through the fraudulent sale of the Esoteric Securities.

299.    Defendants' material omissions regarding the Esoteric Securities transactions listed in Paragraph 296 above were part of a device, scheme or artifice to defraud Sentinel in connection with the sale of the Esoteric Securities.

300.    Sentinel reasonably relied on defendants' false and misleading statements and omissions in purchasing these securities.

301.    Sentinel would not have purchased the securities absent defendants' false and misleading statements and omissions.

302.    Sentinel's losses were caused when the value of these securities declined because of the very facts which were misrepresented and omitted.

303.    The Trustee gave notice of its election to void and rescind the purchase of securities within six months after obtaining knowledge that the sale of the securities to Sentinel was voidable.

WHEREFORE, Plaintiff respectfully requests that the Court enter judgment in favor of Plaintiff and against defendants for rescission and for the full amount paid for the Esoteric Securities transactions listed in Paragraph 296  above, together with interest from the date of payment less any income or other amounts received by Sentinel on the securities and the amount received by Sentinel for or on account of the disposition of the securities.

## COUNT SIX

### Violation of the Illinois Consumer Fraud Act
### 815 ILCS § 505/1
### (All Defendants)

304.    Plaintiff restates and realleges paragraphs 1 through 303 of this Complaint as though fully set forth herein.

305.    Defendants engaged in deceptive acts or practices in connection with the sale of Esoteric Securities to Sentinel.    Those deceptive acts or practices included the misrepresentations, omissions and bribery described above.

306.    Sentinel was a consumer, as that term is defined in 815 ILCS § 505/2(c), in connection with the purchase of securities from defendants.  Defendants' sale of securities to Sentinel implicated consumer protection concerns.

307.    Defendants intended that Sentinel rely on their deceptive acts and practices.

308.     Defendants' deceptive conduct occurred in the course of its conduct involving trade and commerce, namely, the sale of securities.

309.     Defendants' deceptive conduct was material to the transactions with Sentinel.

310.     Sentinel suffered harm proximately caused by defendants' deceptive conduct. Specifically, Sentinel purchased hundreds of millions of dollars in unsuitable securities. Sentinel's losses were caused when the value of these securities declined because of the very facts which were misrepresented, omitted or which rendered these securities unsuitable.  Sentinel would not have suffered these losses if the facts were as Sentinel believed them to be.

WHEREFORE, Plaintiff respectfully requests that the Court enter judgment in favor of Plaintiff and against defendants for compensatory damages, plus punitive damages in an amount to be determined by the Court, interest, costs, and attorneys' fees, and grant such other relief as may be appropriate.

## COUNT SEVEN

### Negligence
### (All Defendants)

311.     Plaintiff restates and realleges paragraphs 1 through 310 of this Complaint as though fully set forth herein.

312.     Defendants' business involved providing recommendations and other information about securities to prospective purchasers, including recommending the purchase of securities based on the characteristics of those securities and the prospective purchasers' investment objectives and financial circumstances.

313.     Defendants owed a duty to Sentinel, arising under the common law and under FINRA Rule 2310 and similar suitability rules, to recommend only suitable securities to Sentinel.

314.     Defendants breached that duty by negligently recommending that Sentinel purchase securities, including the Esoteric Securities.  KBW and Cohen further breached that duty by negligently failing to supervise its agents.

315.     Relying on defendants' recommendations, Sentinel purchased unsuitable securities.

316.     Sentinel has been damages as a result of defendants' negligently recommending the purchase of unsuitable securities.

WHEREFORE, Plaintiff respectfully requests that the Court enter judgment in favor of Plaintiff and against defendants for compensatory damages, interest, costs, and attorneys' fees, and grant such other relief as may be appropriate.

## COUNT EIGHT

### Unjust Enrichment
### (All Defendants)

317.     As a result of the conduct alleged in this Complaint, defendants wrongfully received direct and indirect benefits from Sentinel which should have inured to the benefit of Sentinel.

318.     Defendants have been unjustly enriched, and equity requires that they disgorge and pay the amount by which they have been unjustly enriched.

WHEREFORE, Plaintiff respectfully requests that the Court enter judgment in favor of Plaintiff and against all defendants, jointly and severally, order disgorgement of all profits, fees, commissions and income received by defendants in connection with the sale of Esoteric Securities to Sentinel (plus interest, costs and attorneys' fees) and grant such other equitable relief as may be just and appropriate.

<u>COUNT NINE</u>

**Avoidance and Recovery of Fraudulent Transfers Pursuant to
§§ 548(a)(1)(A) and 550(a) of the Bankruptcy Code
(Defendant KBW)**

319.    Plaintiff restates and realleges paragraphs 1 through 318 of this Complaint as though fully set forth herein.

320.    Mosley and certain other insiders engaged in a fraud scheme to misuse what were supposed to be customer assets for their own benefit.

321.    These insiders improperly pledged securities that should have been segregated for customers as collateral for Sentinel's bank loan.  The funds generated by the bank loan were used by Mosley to fund speculative and risky trading in instruments like the Esoteric Securities for the benefit of certain Sentinel insiders.

322.    The insiders perpetrated and concealed the fraud by, among other things, sending the customers fictitious account statements which did not reflect the leverage and which falsely represented that securities were being held in segregation for their benefit when in fact they were not in segregation but were pledged for the bank loan.

323.    From March 1, 2006 to September 21, 2006, Sentinel purchased the following securities from KBW:

| Settlement Date | Par Amount | Description | Identifier |
|---|---|---|---|
| 03/01/2006 | 3,000,000 | PRETSL FLOAT | 74040QAB5 |
| 03/01/2006 | 6,000,000 | PRETSL FLOAT | 74042JAA1 |
| 03/01/2006 | 12,000,000 | PRETSL FLOAT | 74042JAE3 |
| 03/01/2006 | 5,000,000 | PRETSL FLOAT | 74042JAG8 |
| 03/01/2006 | 10,000,000 | PRETSL FLOAT | 74042JAG8 |
| 03/03/2006 | 6,300,000 | PRETSL FLOAT | 74042JAG8 |
| 03/21/2006 | 1,000,000 | PRETSL FLOAT | 74040TAC7 |
| 03/31/2006 | 2,000,000 | ALESC 10A D1 | 01449WAF3 |
| 04/04/2006 | 5,000,000 | ALESC 10A C1 | 01449WAD8 |
| 06/15/2006 | 1,000,000 | PRETSL FLOAT | 74042MAJ5 |
| 06/15/2006 | 9,000,000 | PRETSL FLOAT | 74042MAJ5 |

| 06/15/2006 | 5,000,000 | PRETSL FLOAT | 74042MAN6 |
| 06/15/2006 | 5,000,000 | PRETSL FLOAT | 74042MAN6 |
| 09/21/2006 | 7,000,000 | PRETSL FLOAT | 74043AAC5 |
| 09/21/2006 | 10,000,000 | PRETSL FLOAT | 74043AAQ4 |
| 09/21/2006 | 2,000,000 | PRETSL FLOAT | 74043AAW1 |

324. In connection with each of the foregoing purchases of securities, Mosley caused Sentinel to transfer cash and/or securities to KBW (the "KBW Transfers").

325. Each of the KBW Transfers was made in furtherance of the insiders' fraud scheme and was made with the actual intent to hinder, delay, or defraud Sentinel's creditors.

326. Each of the KBW Transfers was made, mediately or immediately, to or for the benefit of KBW.

327. Each of the KBW Transfers constituted transfers of interests in Sentinel's property. In particular, the transfers of funds and securities were made from Sentinel's unsegregated accounts at the Bank of New York. Those assets transferred to KBW constitute property of Sentinel by virtue of, among other things, Sentinel's failure to separately account for assets supposed to belong to customers, the commingling of assets, Sentinel's treatment of the assets, and the other facts and circumstances of the case.

328. The Trustee may avoid all KBW Transfers pursuant to section 548(a)(1)(A) of the Bankruptcy Code.

329. The Trustee may recover, for the benefit of the estate, the KBW Transfers or their value from the defendants as either the initial transferee of the KBW Transfers or the entity for whose benefit the KBW Transfers were made pursuant to section 550(a) of the Bankruptcy Code.

WHEREFORE, Plaintiff respectfully requests that the Court enter an Order: avoiding each of the KBW Transfers pursuant to section 548(a)(1)(A) of the Bankruptcy Code; ordering

the return and recovery of the KBW Transfers, or entering judgment against each defendant pursuant to section 550(a) of the Bankruptcy Code in the amount of the KBW Transfers made to or for the benefit of each such defendant; awarding the Trustee punitive damages in an amount to be determined by the Court, pre- and post-judgment interest, costs and attorneys' fees and expenses; and granting such other equitable relief as may be just and proper.

## COUNT TEN

### Avoidance and Recovery of Fraudulent Transfers Pursuant to §§ 548(a)(1)(A) and 550(a) of the Bankruptcy Code (Defendant Cohen)

330.    Plaintiff restates and realleges paragraphs 1 through 329 of this Complaint as though fully set forth herein.

331.    Mosley and certain other insiders engaged in a fraud scheme to misuse what were supposed to be customer assets for their own benefit.

332.    These insiders improperly pledged securities that should have been segregated for customers as collateral for Sentinel's bank loan.  The funds generated by the bank loan were used by Mosley to fund speculative and risky trading in instruments like the Esoteric Securities for the benefit of certain Sentinel insiders.

333.    The insiders perpetrated and concealed the fraud by, among other things, sending the customers fictitious account statements which did not reflect the leverage and which falsely represented that securities were being held in segregation for their benefit when in fact they were not in segregation but were pledged for the bank loan.

334.    From May 16, 2006 to June 28, 2007, Sentinel purchased the following securities from Cohen:

| Settlement Date | Par Amount | Description | Identifier |
|---|---|---|---|
| 05/16/2006 | 5,000,000 | PRETSL 4.775 | 44984SAD8 |
| 06/27/2006 | 7,000,000 | TBRNA 2006 6A D1 | 87331AAG9 |
| 06/27/2006 | 5,000,000 | TBRNA 2006 6A E1 | 87331AAJ3 |
| 06/29/2006 | 5,000,000 | ALESC 11A D | 01449YAA0 |
| 06/29/2006 | 5,000,000 | ALESC 11A C1 | 01450AAD2 |
| 07/07/2006 | 5,000,000 | REG DIV | 75902YAA4/PP4DODG68 |
| 08/25/2006 | 5,000,000 | ALESC 10A C1 | 01449WAD8 |
| 08/29/2006 | 1,000,000 | ALESC 10A C1 | 01449WAD8 |
| 09/13/2006 | 1,000,000 | PRETSL FLOAT | 74040TAC7 |
| 09/28/2006 | 5,000,000 | TBRNA 2006-7A A3L | 873315AE5 |
| 09/29/2006 | 2,000,000 | PRETSL 4.15 | 74040YAF9 |
| 10/12/2006 | 5,000,000 | REG DIV | 75902YAA4/PP4DODG68 |
| 10/12/2006 | 10,000,000 | ALESC 12A C1 | 01450DAE4 |
| 10/12/2006 | 10,000,000 | TBRNA 2006-7A A3L | 873315AE5 |
| 11/30/2006 | 5,000,000 | ALESC 13A B | 014495AD7 |
| 11/30/2006 | 10,000,000 | ALESC 13A B | 014495AD7 |
| 11/30/2006 | 5,000,000 | ALESC 13A C1 | 014495AE5 |
| 01/22/2007 | 6,000,000 | ALESC 12A B | 01450DAD6 |
| 02/06/2007 | 1,000,000 | ALESC 12A C1 | 01450DAE4 |
| 02/06/2007 | 2,000,000 | ALESC 12A C1 | 01450DAE4 |
| 02/15/2007 | 7,290,000 | TBRNA 2005-2A E1 | 87330UAK7 |
| 02/20/2007 | 1,000,000 | TBRNA 2005-3A D | 87330WAJ6 |
| 02/28/2007 | 7,000,000 | TBRNA 2006-5A A3FX | 87331BAG7 |
| 03/29/2007 | 5,000,000 | ALESC 2007-15A C1 | 01450BAD0 |
| 03/29/2007 | 3,000,000 | ALESC 2007-15A C1 | 01450BAD0 |
| 03/29/2007 | 2,000,000 | ALESC 2007-15A C1 | 01450BAD0 |
| 03/29/2007 | 5,000,000 | TBRNA 2007 8A E | 87331VAL2 |
| 03/29/2007 | 5,000,000 | TBRNA 2007 8A E | 87331VAL2 |
| 04/02/2007 | 3,000,000 | ALESC 10A C1 | 01449WAD8 |
| 04/02/2007 | 5,000,000 | ALESC 12A C1 | 01450DAE4 |
| 04/02/2007 | 2,388,000 | PRETSL FLOAT | 74041EAA3 |
| 04/02/2007 | 2,500,000 | TBRNA 2005-3A C1 | 87330WAG2 |
| 04/02/2007 | 3,500,000 | TBRNA 2005-4A C1 | 87330YAF0 |
| 04/02/2007 | 3,500,000 | TBRNA 2006-7A A3L | 873315AE5 |
| 04/09/2007 | 10,000,000 | TBRNA 2007-8A A2 | 87331VAG3 |
| 04/17/2007 | 5,000,000 | TBRNA 2007-8A A2 | 87331VAG3 |
| 05/18/2007 | 5,700,000 | TBRNA 2005-2A C1 | 87330UAF8 |
| 06/26/2007 | 10,000,000 | KLROS 2007-8A A3 | 49859EAD0 |
| 06/28/2007 | 8,000,000 | ALESC 16A C | 01450GAC1 |

335.    In connection with each of the foregoing purchases of securities, Mosley caused Sentinel to transfer cash and/or securities to Cohen (the "Cohen Transfers").

336.    Each of the Cohen Transfers was made in furtherance of the insiders' fraud scheme and was made with the actual intent to hinder, delay, or defraud Sentinel's creditors.

337.    Each of the Cohen Transfers was made, mediately or immediately, to or for the benefit of Cohen.

338.    Each of the Cohen Transfers constituted transfers of interests in Sentinel's property. In particular, the transfers of funds and securities were made from Sentinel's unsegregated accounts at the Bank of New York.  Those assets transferred to Cohen constitute property of Sentinel by virtue of, among other things, Sentinel's failure to separately account for assets supposed to belong to customers, the commingling of assets, Sentinel's treatment of the assets, and the other facts and circumstances of the case.

339.    The Trustee may avoid all Cohen Transfers pursuant to section 548(a)(1)(A) of the Bankruptcy Code.

340.    The Trustee may recover, for the benefit of the estate, the Cohen Transfers or their value from the defendants as either the initial transferee of the Cohen Transfers or the entity for whose benefit the Cohen Transfers were made pursuant to section 550(a) of the Bankruptcy Code.

WHEREFORE, Plaintiff respectfully requests that the Court enter an Order: avoiding each of the Cohen Transfers pursuant to section 548(a)(1)(A) of the Bankruptcy Code; ordering the return and recovery of the Cohen Transfers, or entering judgment against each defendant pursuant to section 550(a) of the Bankruptcy Code in the amount of the Cohen Transfers made to or for the benefit of each such defendant; awarding the Trustee punitive damages in an amount to

be determined by the Court, pre- and post-judgment interest, costs and attorneys' fees and expenses; and granting such other equitable relief as may be just and proper.

Dated: January 12, 2009

Respectfully submitted,

FREDERICK J. GREDE, not individually but as Liquidation Trustee and Representative of the Estate of Sentinel Management Group, Inc.

By:___ Chris Gair ____
    */s/ Chris Gair*

One of his attorneys

J. Kevin McCall (ARDC #3125685)
Catherine L. Steege (ARDC # 6183529)
Chris C. Gair (ARDC # 6190781)
Vincent E. Lazar (ARDC # 6204916)
JENNER & BLOCK LLP
330 N. Wabash Ave.
Chicago, IL  60611
Phone: (312) 222-9350
Facsimile: (312) 527-0484