**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| FREDERICK J. GREDE, not individually, but as Liquidation Trustee and Representative of the Estate of Sentinel Management Group, Inc.,<br><br>      Plaintiff,<br><br>      v.<br><br>DELORES E. RODRIGUEZ, BARRY C. MOHR, JR., JACQUES DE SAINT PHALLE, KEEFE BRUYETTE & WOODS, INC., and COHEN & COMPANY SECURITIES, LLC,<br><br>      Defendants. | No. 09-cv-00193<br>Judge James B. Zagel |

## MEMORANDUM OPINION AND ORDER

## I. BACKGROUND

Sentinel Management Group, Inc. was a registered futures commission merchant with the Commodities Future Trading Commission and a registered investment advisor with the Securities and Exchange Commission. Sentinel did nothing other than manage investments. Its income was derived from its management fees based on the assets it held under management. It marketed itself with an attractive and very commonplace objective: "to achieve the highest yield consistent with the preservation of principal and daily liquidity." Its clients were supposed to be sophisticated investors and included hedge funds, futures commission merchants, financial institutions, pension plans and so forth. Sentinel had customer funds and a house account for its own securities and the benefit of insider investors. Charles Mosley was Sentinel's chief trader.

In mid-2007, Sentinel went over the cliff. On August 13, it announced a halt of redemption

of customer assets; four days later it filed here for Bankruptcy protection. Trustee alleges that "[c]ertain insiders at Sentinel treated the funds of all customers and those of Sentinel itself as a single, commingled pool," and that Mosley "purchased huge quantities of [collateralized debt obligations ("CDOs")] with funds from this pool, employing a massive leveraging scheme that was concealed from Sentinel's customers and regulators."

Trustee maintains that Defendants sold Sentinel hundreds of millions of dollars in highly risky and illiquid financial products. Mosley financed these purchases in two ways: (1) the use of funds loaned to Sentinel by Bank of New York, which were unlawfully secured with customer assets; and (2) the use of repurchase agreements under which Sentinel transferred the purchased security to a repo counterparty which then loaned Sentinel a percentage of the price of the security and used the security itself as collateral. When Fimat, a repo counterparty, refused to continue financing the CDOs and returned them to Sentinel, Sentinel bought them back with a loan from Bank of New York and tried to re-sell them in order to pay down the loan. Nearly two months later, at the time of its collapse, Sentinel lost close to $100 million total from the closeout sales of these securities.

According to Plaintiff, Defendants employed a "deceptive scheme" involving bribery, omissions, and misrepresentations in an effort to sell Mosley the CDOs. The scheme allegedly began in 2004 when the individual Defendants were employed by KBW. When Rodriguez and Mohr left KBW in 2006, they are alleged to have continued the scheme at their new employer, Cohen.

As part of their scheme, Defendants recommended and sold securities to Sentinel without disclosing that they were unsuitable for Sentinel's portfolio. These CDOs typically mature at 30

years, and the secondary market for these instruments is limited. According to Plaintiff, many of the CDOs at issue did not qualify as investment grade securities. Many were not rated by any nationally recognized credit agency, and those that were had qualifications attached to those ratings disqualifying them as investment grade. Plaintiff further alleges that Defendants sold CDOs to Sentinel with ratings information that they knew was false, leading Mosley to believe he was buying investment-grade securities when he, in fact, was not, and that Defendants made false and misleading statements about the liquidity of the securities, specifically their willingness to make a market in these securities. Defendants, knowing they had limited capital and resources, knew that they could not repurchase all of the instruments they sold to Sentinel, particularly within a time frame that could work with Sentinel's objective of daily liquidity.

Plaintiff claims that part of Defendants' scheme to sell Mosley the unsuitable investment instruments included inducing and suborning Mosley to the point where he "was unable to and in fact did not exercise disinterested judgment in accepting their recommendations that Sentinel purchase the [CDOs] offered to him by defendants." While at KBW, Defendants offered, and Mosleys accepted, tickets to professional sporting events and a Big 10 football game, expensive dinners, limousine rides, concert tickets, a trip to Florida including lodging, entertainment, limousine rides, and tickets to the Orange Bowl football game (in a luxury sky box), trips to strip clubs (lap dances included), and an expenses-paid trip to New York (hotel included). Once Mohr and Rodriguez moved to Cohen, the "gifts" continued, including more tickets to professional sporting events, expensive dinners, limousine rides, the purchase of $600 in Girl Scout Cookies from Mosley's daughter, and an expenses-paid golf outing in Philadelphia. The complaint is also rife with offers of more event tickets, trips, and the use of vacation homes.

Plaintiff alleges that Defendants often failed to provide Mosley with any offering memoranda, either prior to the purchase or at all. Moreover, Plaintiff argues, any disclaimers in these memoranda would have been ineffective to "counteract" any misrepresentations made to Mosley due to the bribery scheme, Mosley's lack of capacity to understand the risks associated with the CDOs, and the Defendants' violation of their affirmative duty pursuant to Financial Industry Regulatory Authority ("FINRA") rules, not to recommend unsuitable securities.

Another part of the alleged scheme involved Defendants' repurchase of CDOs they had sold to Mosley, thereby freeing up funds for Mosley to buy more unsuitable CDOs. In addition to these claims of "excessive trading," Trustee also alleges that KBW sold to Sentinel, through Mosley, a $30 million note in a round-trip transaction, so it could be removed from KBW's balance sheet. Sentinel held the note for about one week, and KBW then repurchased it for a carrying charge and small profit. There are also allegations of a similar transaction where Cohen purchased from Sentinel $8 million in securities that could not be financed through repo-counterparties, held the securities for one month, and sold them back to Sentinel for the same price so that they could be removed from Sentinel's balance sheet over year end.

Plaintiff's complaint against Defendants in this case contains the following twelve counts: (1) aiding and abetting Mosley's breach of fiduciary duty against all Defendants; (2) commercial bribery against all Defendants; (3) Rule 10(b)-5(a)-(c) securities fraud violations against all Defendants; (4) violation of the Illinois Blue Sky Law against Defendants KBW, Rodriguez, Mohr, and de Saint Phalle, (5) violation of the Illinois Blue Sky Law against Defendants Cohen, Rodriguez, and Mohr; (6) violation of the Illinois Consumer Fraud Act against all Defendants; (7) Negligence against all Defendants; (8) unjust enrichment against all

defendants; (9) avoidance and recovery of fraudulent transfers against Defendant KBW; and (10) avoidance and recovery of fraudulent transfers against Defendant Cohen. Defendants now move to dismiss the complaint. For the following reasons, their motions to dismiss count 6, the Illinois Consumer Fraud Act claim, is granted as to all Defendants, and their motions to dismiss the remaining claims are denied. Defendant KBW has moved to sever the claims against it from the complaint. The Motion to Sever is granted.

## II. STANDARD OF REVIEW

A Rule 12(b)(6) motion tests the sufficiency of a complaint, not the merits of a case. *Autry v. Northwest Premium Servs., Inc.*, 144 F.3d 1037, 1039 (7th Cir. 1998). I must accept all well-pleaded factual allegations in the complaint as true, drawing all reasonable inferences from those facts in Plaintiff's favor. *Cleveland v. Rotman*, 297 F.3d 569, 571 (7th Cir. 2002). "While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (citations and quotations omitted). Plaintiff's factual allegations must be sufficient "to raise a right to relief above the speculative level." *Id.* To survive, a complaint must contain enough facts, when, accepted as true, "state a claim to relief that is plausible on its face." *Id.* at 570. Where a complaint pleads facts that are "merely consistent with" a defendant's liability, it "stops short of the line between possibility and plausibility of 'entitlement to relief.' " *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949 (2009) (citation omitted).

## III. DISCUSSION

### A. Governing Law

Defendants first argue that the relevant offering documents designate New York law as governing, and that under New York law the state law counts (1, 2, 4, 5, 6, 7, 8) should be dismissed. The foundation for this argument is problematic and dooms Defendants' contention. Plaintiff's complaint expressly references KBW's offering documents, stating

> Although offering memoranda were presumably prepared in connection with the initial issuance of the [CDOs], in many cases such memoranda were not provided to Mosley prior to Sentinel's purchase of such securities and in some instances were not provided at all. Moreover, any disclaimers in such memoranda would have been ineffective to counteract the misrepresentations made to Mosley because: (a) Mosley, who would have received such memos, was suborned by the things of value provided to him; (b) Mosley did not have the capacity to understand the risks of these securities or any disclosures concerning the securities; (c) defendants had an affirmative duty not to recommend the purchase of securities that they knew to be unsuitable, notwithstanding disclaimers.

It is true that Plaintiff does not attach, quote from or discuss the content of the memoranda at issue. However, according to KBW, the court should consider the offering documents as part of the motion to dismiss. The Seventh Circuit has recently ruled that where documents attached to a defendant's motion to dismiss are referred to in the complaint, authentic and central to the Plaintiff's claim, they may be properly considered in deciding a motion to dismiss, despite the fact that the documents were not attached to the complaint. *Hecker v. Deere & Co.*, 556 F.3d 575, 582-83 (7th Cir. 2009). In *Hecker*, plaintiffs, participants in an ERISA pension plan, filed suit against their 401(k) plan sponsor alleging breaches of fiduciary duty by failing to disclose the plan's fee structure to its participants. *Id.* at 577. In moving to dismiss the complaint, defendant attached numerous summary plan descriptions ("SPDs") and a Trust

Agreement. *Id.* at 582. The Seventh Circuit held that the district court properly considered the attachment. *Id.* at 582-83. "The Complaint explicitly refers to the SPDs and the Trust Agreement, and both are central to plaintiffs' case: the SPDs reveal the disclosures that [defendant] made to [plaintiffs], and the Trust Agreement throws light on the relationship between [the trust] and [defendant]." *Id.*

KBW maintains that that is indeed the case here; however, I disagree. The offering memoranda are not central to the Plaintiff's complaint. Plaintiff alleges that in many instances, the memoranda were *not provided* to Mosley, either prior to the purchase of securities or at all. It appears to be their absence that is crucial to this claim, not the memoranda themselves. The contents of the memoranda are not at issue - no one disputes the disclosures made therein, and they are not dispositive of or central to the claims. *See Tierney v. Vahle*, 304 F.3d 734, 739 (7th Cir. 2002) (a court may consider a document attached to a motion to dismiss where the document is "dispositive of the claim" at issue, "even if the plaintiffs had not attached it to their complaint").

KBW further argues that the choice of law provisions contained in the offering documents govern non-contract claims because "the non-contract claims could not have existed without the relevant contracts." In support of its claim, KBW cites *Grede v. Bank of New York*, 2009 WL 188460, *9 (N.D. Ill. Jan 27, 2009), *LaSalle Bank v. Nat'l Ass'n v. Paramount Props., LLC*, 588 F. Supp. 2d 840, 849 (N.D. Ill. 2008), and *Omnicare, Inc. v. UnitedHealth Group, Inc.*, 594 F. Supp. 2d 945, 977 (N.D. Ill. 2009). None of these cases prescribes the application of New York law in this case. *Grede* and *LaSalle* both involved claims dependent on the construction and interpretation of the contract at issue, and on defendants' alleged breaches in administering

7

those contracts.  In both cases, Plaintiffs' alleged breaches of duties *related to the contract*.  In

*Omicare*, Plaintiff brought a claim for fraud against allegedly conspiring defendants for

coordinating their contract negotiations with plaintiff in order to "fix and depress the prices paid

by defendants to [plaintiff] for providing [services that were the subject of the contract]."  594 F.

Supp. 2d 960.  In that case, the fraud claim, quite literally, could not have existed without the

agreement.  In this case, Plaintiff's aiding and abetting, bribery, Blue Sky, negligence, and unjust

enrichment claims are not dependant upon the offering memoranda or representation letters in

any way.  Unlike *Grede*, the allegations here do not require construction and interpretation of the

memoranda and agreements, nor do they allege violations of duties contained therein.  Unlike

*LaSalle*, Plaintiff here does not claim "the benefit of a duty of care in administering the terms of

the contract."  588 F. Supp. 2d at 850.  In this case, Plaintiff's claims are based neither upon

administration of the agreement, nor duties arising from the agreement.  Therefore, even were I

to consider the offering memoranda, the choice-of-law provision therein does not apply here.  *See*

*Birnberg v. Milk St. Residential Associates Ltd. Partnership*, Nos. 02 C 0978, 02 C 3436, 2003

WL 151929, at *14 (N.D. Ill. Jan 21, 2003) (applying contractual choice-of-law provision to

breach of fiduciary duty claim arising from contract, breach of good faith and fair dealing claim,

and intentional interference with contractual relations claim, but declining to apply the provision

to Illinois Consumer Fraud Act, negligent misrepresentation and fraud claims based on

misstatements and omissions related to the agreement, but not premised upon the interpretation

of the agreement).

**B.  *In Pari Delicto***

Defendants next argue that *in pari delicto* bars several, if not all, of Plaintiff's claims.

Because I have addressed the doctrine at length in several related opinions,  *Grede v. McGladrey*

*& Pullen, LLP*, No. 08 C 2205, 2008 WL 4425447, at *3-*7 (N.D. Ill. Sept. 26, 2008) and *Grede*

*v. Bank of New York*, No. 08 C 2582, 2009 WL 188460, at *9 (N.D. Ill. Jan. 27, 2009), I see no

need to recycle the text here. Because *in pari delicto* is a defense, is distinct from the *Wagoner*

rule, which addresses standing.  *Id.*  Defendants do not address the adverse interest exception to

*in pari delicto*,[1] but rather attempt to bypass it by invoking the sole actor rule.  To support their

argument that this exception to the adverse interest exception applies to bar the claim,

Defendants rely on statements made in the complaints against Sentinel founder Philip Bloom,

and his son Eric Bloom, both officers of the company.  According to the Defendants, because

Mosley and the Blooms were "sole actors," their alleged wrongdoing may be imputed to

Sentinel, and the claims against Defendants must be dismissed.  Defendants cite the following

allegations from the complaints:

> The Blooms were "the controlling shareholders, directors and officers" of
> Sentinel.
>
> The Blooms and Mosley used Sentinel's official channels of communications
> (e.g., its website and customer statements), which they alone controlled, to make
> misrepresentations to Sentinel's customers.
>
> The Blooms and Mosley unlawfully commingled and transferred customer assets.

---

[1] The adverse interest exception to *in pari delicto* states that insider wrongdoing may not be imputed to the corporation where the insiders acted entirely for their own benefit and their actions in no way benefitted the corporation.  *McGladrey*, 2008 WL 4425447, at *5.  Just as in *McGladrey*, the record remains fairly undeveloped on this point, and 12(b)(6) dismissal would be inappropriate.  *See ABN AMRO, Inc. v. Capital Intern. Ltd.*, 595 F. Supp. 2d 805, 851 (N.D. Ill. 2008) (an affirmative defense is not a proper basis to dismiss a claim by a motion to dismiss unless the face of the complaint shows beyond doubt that an affirmative defense is dispositive).

The Blooms and Mosley misallocated Sentinel's customer trading and interest income.

Eric Bloom caused Sentinel to pay him a $50,000 per month "management fee."

Sentinel transferred more than $20 million to the Blooms and Mosley in the year before its collapse. Most of these funds were transferred to the Blooms and/or to entities owned and/or controlled by them.

However, the Bloom complaints are not properly before this court. Defendants argue that judicial estoppel bars the trustee from avoiding the allegations in those complaints because he "prevailed" in a settlement with the Blooms. *See Kale v. Obuchowski*, 985 F.2d 360, 362 (7th Cir. 1993) ("Persons who triumph by inducing their opponents to surrender have 'prevailed' as surely as persons who induce the judge to grant summary judgment" and therefore the beneficiary of a favorable settlement "is stuck with that proposition in subsequent litigation."). However, as Plaintiff correctly points out, in order for judicial estoppel to apply, it "must be shown that the party against whom estoppel is invoked succeeded on the pertinent position, or that the position was somehow a basis for or important to the settlement." *Remus v. Sheahan*, No. 05 C 1495, 2006 WL 418654, 11 (N.D. Ill. 2006). In this case, many allegations were leveled against the Blooms, including commingling of funds, misappropriation, running a leveraging scheme, and preparing false customer statements. It cannot be presumed that allegations cited by Defendants were the basis for the settlement. Furthermore, even if they were, none of these allegations demonstrates the Bloom's knowledge of the alleged bribery, purchase of below-grade securities, or any dealings with Defendants. Without any such allegations, the sole actor rule would not apply with regard to the particular misconduct complained of here. Because Defendants have failed to successfully demonstrate that the sole actor rule applies here, Trustee's claims cannot be dismissed under Rule 12(b)(6) on the basis of *in pari delicto*.

## C.  Securities Fraud

Defendants next argue that Plaintiff fails to state a claim for securities fraud pursuant to Rule 10b-5(a)-(c) of the Securities Exchange Act of 1934.[2]  Trustee alleges that Defendants violated Rule 10b-5 when they violated their duty under New York Stock Exchange and FINRA Rules to recommend only suitable securities to Sentinel.[3]  For an unsuitability claim, "[a] plaintiff must prove (1) that the securities purchased were unsuited to the buyer's needs; (2) that the defendant knew or reasonably believed the securities were unsuited to the buyer's needs; (3) that the defendant recommended or purchased the unsuitable securities for the buyer anyway; (4) that, with scienter, the defendant made material misrepresentations (or, owing a duty to the buyer, failed to disclose material information) relating to the suitability of the securities; and (5) that the buyer justifiably relied to its detriment on the defendant's fraudulent conduct."  *Brown v. E.F. Hutton Group, Inc.*  991 F.2d 1020, 1031 (2d Cir. 1993).  Because this claim is rooted in

---

[2] Rule 10b-5 states: It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange,

1.  To employ any device, scheme, or artifice to defraud,
2.  To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or
3.  To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security.

[3] Trustee specifically cites NYSE Rule 405, requiring Defendants to use "due diligence to learn the essential facts relative to every customer, every order . . . and every person holding power of attorney over any account accepted or carried by such organization[;]" and FINRA Rule 2310(a) which imposes a duty on brokers that

> [i]n recommending to a customer the purchase, sale or exchange of any security, a member shall have reasonable grounds for believing that the recommendation is suitable for such customer upon the basis of the facts, if any, disclosed by such customer as to his other security holdings [and] financial situation and needs.

11

fraud, Federal Rule of Civil Procedure 9(b) requires Plaintiff to plead the circumstances constituting fraud with particularity. This means the "who, what, when, where, and how: the first paragraph of any newspaper story." *DiLeo v. Ernst & Young*, 901 F.2d 624, 627 (7th Cir.1990). In securities fraud cases, the Private Litigation Securities Reform Act imposes an even higher pleading standard, requiring Plaintiff to "state with particularity facts giving rise to a strong inference that defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2).

### 1. Discretionary control of accounts

First, Defendants maintain that the suitability rules are limited to accounts over which the broker has discretion. They argue that Mosley's rejection of many trades signals that Defendants did not have discretionary control over the account and therefore, the suitability rules do not apply. In support of their argument, Defendants point to *Associated Randall Bank v. Griffin, Kubik, Stephens & Thompson, Inc.*, 3 F.3d 208, 212 (7th Cir. 1993), in which the Court explained that "[c]ustomer-directed transactions fall outside the [federal] 'suitability' requirement-especially if the agent provides the customer with a prospectus or comparable information." (citing *Brown v. E.F. Hutton Group, Inc.*, 991 F.2d 1020 (2d Cir.1993)). In both *Associate Randall Bank* and *Brown*, there was no dispute that the plaintiffs had offering circulars in their possession prior to making the purchases at issue. In this case, Trustee maintains that in many instances, the offering memoranda were *not provided* to Mosley, either prior to the purchase or at all. The rationale underlying the relied-upon statement from *Associated Randall Bank* is that "having the truth at hand precludes reliance." 3 F.3d at 212. In other words, "[a] person offered a complete written description of the transaction and all its risks is hard put to say that a brief and ambiguous oral statement . . . was material misinformation." *Id.* In this case, Plaintiff alleges that Mosley did not have a complete written description of the risks at hand at the time of

purchase. Without such a description, reliance upon omissions or oral statements is not precluded, and dismissal of the claim would be inconsistent with the Court's rationale in *Associate Randall Bank*.

## 2. Misrepresentations and omissions

Defendants next argue that the complaint fails to adequately allege material misrepresentations. While they are correct in arguing that some of the factual allegations of misrepresentation are particularly weak, Plaintiff's suitability claim rests mostly upon omissions. Furthermore, Plaintiff's allegations encompass more than just an unsuitability claim, including a scheme to defraud and a course of business operated as a fraud upon Sentinel, which are proscribed by Rule 10b-5 (a) & (c). Those sections do not require any allegations of misrepresentations or omissions. *In re Enron Corp. Securities, Derivative & ERISA Litigation*, 235 F. Supp. 2d 549, 577 (S.D. Tex. 2002) ("While subsection (b) of Rule 10b-5 provides a cause of action based on the 'making of an untrue statement of a material fact and the omission to state a material fact,' subsections (a) and (c) 'are not so restricted' and allow suit against defendants who, with scienter, participated in a 'course of business' or a 'device, scheme or artifice' that operated as a fraud on sellers or purchasers of stock even if these defendants did not make a materially false or misleading statement or omission.") (citation omitted).

## 3. Scienter

Trustee alleges that the sale of unsuitable securities, together with Defendants' bribing of Mosley, the round-trip transactions, excessive trading, and financial motive establish scienter on the part of the Defendants, however, the sale of unsuitable securities and bribery allegations lend the strongest support to this claim. Defendant Cohen argues that Plaintiff's bribery allegations are unfounded, but its argument is unpersuasive. "Commercial bribery is a garden variety of

fraud," where one bribes an employee or agent without consent of the employer or principal. *Williams Electronics Games, Inc. v. Garrity*, 366 F.3d 569, 572 (7th Cir. 2004) (recognizing a common law commercial bribery claim). "The essence of commercial bribery is that the seller is secretly giving a bribe to the customer's agent to induce the agent to betray his principal (the customer) by purchasing the seller's product even though it is not in the customer's best interest." *Mantek Div. of NCH Corp. v. Share Corp.*, 780 F.2d 702, 705 n.3 (7th Cir. 1986).

Cohen claims that several of the lunches and dinners that were alleged bribes were provided to Sentinel's entire office, and that the football game, golf outing, and Girl Scout cookie purchases from Mosley's daughter do not rise to the level of bribery in light of *United States Sec. and Exchange Comm'n v. Zwick*, No. 03 Civ. 2742, 2007 WL 8311812 (S.D.N.Y. Mar. 16, 2007). In that case, Defendant's bribery scheme, which included tickets to an NBA All-Star game, supported a finding of scienter. Cohen argues that crucial to the holding in *Zwick* were the fact that Zwick did not attend the game with his client, in violation of the NASD rules, and that there was an explicit quid pro quo, followed by Zwick's efforts to conceal the source of the tickets. While it is true that these facts supported the finding of scienter, *Zwick* was decided on a post-trial Rule 50 motion, and the facts cited by Cohen were rooted in evidence presented at trial. The court made no finding as to what is required to plead commercial bribery such that it supports scienter. In his allegations, Trustee notes the particular timing of the alleged bribes in connection with the purchases of securities, sometimes days apart. Even though several of the allegations include the purchase of meals for Sentinel's staff, one cannot reasonably infer the Bloom's awareness of the other alleged bribes, e.g. the purchase of 150 boxes of Girl Scout cookies from Mosley's daughter, attendance of a Jets game in New York City, etc. Here, Trustee has successfully pled commercial bribery, and the claim stands.

14

In evaluating scienter, "courts must consider the complaint in its entirety[.]"
*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 127 S. Ct. 2499, 2509 (2007). "The inquiry . . . is whether all of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard." *Id.* A complaint survives, "only if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged." *Id.* at 2510. "A strong inference of fraudulent intent may be established . . . by alleging facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness." *Honeyman v. Hoyt* (*In Re Carter-Wallace, Inc. Secs. Litig.*), 220 F.3d 36, 39 (2d Cir. 2000) (citation and quotation marks omitted).

The complaint alleges that Defendants knew the securities sold to Sentinel were unsuitable. Pursuant to FINRA Rule 2310, Defendants had a duty to "know [their] customer." According to Trustee, Sentinel's investment objectives were publicly available on the company's website, including statements that Sentinel ensured that client cash was safe and liquid and that Sentinel bought only the "highest quality and most liquid securities." Although the site also explained that clients could specifically direct investments in lower quality issues, Sentinel explicitly promised that it would not use derivative, options, or "any other 'financial engineering' techniques to enhance yields on its portfolios." Defendants argue that the securities were being purchased for Sentinel's house account, and that these public statements do not apply. However, alleged statements by a KBW managing director in response to seeing the site suggest that KBW and the individual Defendants may have known of the unsuitability of the securities, or at least that Mosley and Sentinel may not have understood the risks involved with them. Furthermore, Trustee claims, Defendants knew that Mosley was incapable of independently evaluating the risk

of the securities, and he was unable to exercise independent judgment due to the alleged bribes being offered him, as well as his lack of capacity to comprehend the complexity of the instruments themselves.[4]  When taken collectively, these allegations give rise to a strong inference of scienter.[5]

### 4. Reliance

Defendants claim that any reliance on Defendants' omissions and misrepresentations is unjustifiable because the letter agreements disclaim reliance on anything other than the offering circulars, and the complaints against the Blooms allege that they purchased illiquid and risky securities.  These arguments rely on documents not properly before the court, see *supra*, and for this reason, they fail.  Furthermore, count 3 alleges two types of omissions – the failure to disclose to Sentinel the unsuitability of the securities and the bribery of Mosley.  It is important to note that "in face-to-face transactions involving only material omissions, a plaintiff need not prove reliance; the omission's materiality and the defendant's duty to disclose supply the requisite

---

[4] According to the Order Approving NASD Suitability Interpretation, 61 Fed. Reg. 44100, FN19 (Aug. 27, 1996), "the two most important considerations in determining the scope of a member's suitability obligations in making recommendations to an institutional customer are the customer's capability to evaluate investment risk independently, and the extent to which the customer is exercising independent judgment in evaluating a member's recommendation. . . [I]f a customer is either generally not capable of evaluating investment risk or lacks sufficient capability to evaluate the particular product, the scope of the member's obligation under the suitability rule would not be diminished by the fact that the member was dealing with an institutional customer."

According to the allegations, de Saint Phalle was one of the persons who created one type of CDO sold to Sentinel.  The inference here is that de Saint Phalle knew how complex these financial instruments were and might have had greater insight into evaluating Mosley's understanding of the investments.

[5] Trustee also alleges that Defendants regularly received information on Sentinel's overall portfolio, and knew (or should have known) that by March 1, 2006, Sentinel's non-customer accounts had balances of $13 million, and yet Sentinel controlled more than $185 million in CDOs, indicating that customers' funds were used for the purchases.  However, this fact is not pled with the particularity required by the PSLRA, in that it fails to identify the form or source of the information.

causation." *Rowe v. Maremont Corp.*, 850 F.2d 1226, 1233 n.4 (7th Cir. 1988); *Affiliated Ute Citizens of Utah v. U. S.*, 406 U.S. 128, 153 (1972)  (where a case involves "a failure to disclose, positive proof of reliance is not a prerequisite to recovery.").  Here, plaintiff alleges omissions of unsuitability, which do not require proof of reliance.  Additionally, there is still a factual question as to whether the Blooms knew of the alleged bribes or any of Mosley's interactions with Defendants.  Trustee's claims are adequate in this regard.

### 5. Loss Causation

Finally Defendants argue that Plaintiff has failed to adequately plead loss causation in connection with count 3.  "To plead loss causation, the plaintiff must allege that it was the very facts about which the defendant lied which caused its injuries." *Caremark, Inc. v. Coram Healthcare Corp.*, 113 F.3d 645, 648 (7th Cir. 1997).  "The plaintiff must allege that it was in fact injured by the misstatement or omission of which it complains." *Id.* at 649.  That is precisely what Plaintiff does here.  Trustee alleges that Defendants made misrepresentations and omissions regarding the liquidity and suitability of the securities at issue.  When Fimat, a repo counterparty, refused to continue financing the CDOs and returned them to Sentinel, Sentinel bought them back with a loan from Bank of New York, and tried to re-sell them in order to pay down the loan. Nearly two months later, at the time of its collapse, Sentinel lost close to $100 million total from the closeout sales of these securities.  Had the securities not been unsuitable and illiquid, Trustee argues, Sentinel might have been able to sell them for more and avoid at least some of its losses. Defendants attribute the loss to the credit crisis, "[b]ut the Seventh Circuit does not require a plaintiff to affirmatively rule out those other factors in its complaint; rather, that burden arises at trial." *Ong ex rel. Ong v. Sears, Roebuck & Co.*, 459 F. Supp.2d 729, 748 (N.D. Ill. 2006). Because Trustee pleads that Sentinel's injury was caused by the omissions and

misrepresentations upon which it relied, the complaint is sufficient.

### D. State Law Claims

To the extent that Defendants' arguments in favor of dismissing Plaintiff's state law claims rely on the Bloom complaints and offering circulars, they must be disregarded as those documents are not properly before the court on this motion. *See supra.* Furthermore, Defendant Cohen alleges that claims 1, 2, 5, 6, and 8 are subject to Federal Rule of Civil Procedure 9(b) pleading, which requires Plaintiff to plead the circumstances constituting fraud with particularity. This means the "who, what, when, where, and how: the first paragraph of any newspaper story." *DiLeo v. Ernst & Young*, 901 F.2d 624, 627 (7th Cir. 1990). According to Cohen, these counts should be dismissed because the claims "sound in fraud," and Plaintiff fails to plead them with particularity. Generally, the claims articulated in these counts are subject to Federal Rule of Civil Procedure 8 pleading requirements. *See, e.g., Hefferman v. Bass*, 467 F.3d 596, 601 (7th Cir. 2006) (aiding and abetting claims are subject to Rule 8 pleading requirements). However, "Rule 9(b) applies to 'averments of fraud,' not claims of fraud, so whether the rule applies will depend on the plaintiff['s] factual allegations." *Borsellino v. Goldman Sachs Group, Inc.*, 477 F.3d 502, 507 (7th Cir. 2007) (citation omitted).

I have already addressed the claims of commercial bribery (count 2) and find that they have been sufficiently pled to satisfy Rule 9(b). Count 5, which alleges violations of the Illinois Blue Sky Laws, are based on the same allegations as count 3 (securities fraud), and thus satisfy the Rule 9(b) pleading requirements. Because I address *infra* count 6, the Illinois Consumer Fraud Act claim, I need not address it here.

With regard to count 8, unjust enrichment, the basis for of the claim is that Defendants wrongfully received benefits from Sentinel. This is a backstop claim which does not rely on

fraud.  Similarly, Trustee's aiding and abetting claim, count 1, is not premised upon a fraudulent course of conduct.  The gravamen of these counts is that Defendants recommended and sold unsuitable securities to Sentinel, who purchased them using misused assets, traded excessively with Sentinel to increase profits, engaged in round-trip transactions, and improperly influenced Mosley.  There are no averments of fraud here, and therefore Rule 9(b) does not apply.  Plaintiffs have adequately pleaded this count under Rule 8.

### 1. Aiding and abetting

"Under Illinois law, to state a claim for aiding and abetting, one must allege (1) the party whom the defendant aids performed a wrongful act causing an injury, (2) the defendant was aware of his role when he provided the assistance, and (3) the defendant knowingly and substantially assisted the violation." *Hefferman v. Bass*, 467 F.3d 596, 601 (7th Cir. 2006).

Defendants argue that Plaintiff fails to plead Defendants' actual knowledge that Sentinel's purchases were made with customer assets not authorized for high-yield investment, and that Mosley was breaching a fiduciary duty to Sentinel.  However, Trustee alleges that Defendants regularly received information on Sentinel's overall portfolio, and knew (or should have known) that by March 1, 2006, Sentinel's non-customer accounts had balances of $13 million, and yet Sentinel controlled more than $185 million in CDOs, indicating that customers' funds were used for the purchases.  According to Trustee, Defendants knew that Sentinel did not have enough of its own assets to finance the purchases at issue.  If true, this red flag suggests knowledge of Mosley's breach.  *See Lerner v. Fleet Bank, N.A.*, 459 F.3d 273, 294 (2d Cir. 2006) (bank may be liable for aiding and abetting attorney breach of fiduciary duty by commingling client and lawyer funds where attorney's checks were dishonored for insufficient funds and he transferred funds from fiduciary accounts to personal accounts).

Defendant Cohen cites *National Union Fire Insurance Company of Pittsburgh v. Wilkins-Lowe & Company*, No. 90 C 20357, 1993 WL 453438, at *9 (N.D. Ill. Oct. 27, 1993), for the proposition that actual knowledge is required to state a claim for aiding and abetting liability. In that case, the plaintiff sought to hold the defendants liable for another's breach of fiduciary trust where they "knowingly accepted benefits" from the breach. The court there opined that "Illinois law does not impose upon a third party a duty to investigate its suspicions, if any, that it is receiving funds obtained via a breach of trust by a fiduciary. Nor does Illinois law permit constructive knowledge to satisfy the requirement that a third party knowingly accept benefits to be held liable for the breach." *Id.* However, here Plaintiff alleges that Defendants had access to information that clearly indicated that customer funds were being used for the purchases at issue. Furthermore, Trustee's allegations go beyond Mosley's use of customer funds to make the purchases. They also cite Defendants' improper influence of Mosley, parking schemes, and the sale of unsuitable securities in and of itself. These are actions in which Defendants directly participated, and, if they are true, of which Defendants have actual knowledge. The claim is properly pled.

### 2. Commercial bribery

I have discussed Plaintiff's commercial bribery claim *supra*, in the context of the securities fraud allegations, however, Defendant Cohen makes another argument with regard to this claim - that Plaintiff fails to plead loss causation, or proximate cause, as required under Illinois law. *See Martin v. Heinhold Commodities, Inc.*, 643 N.E.2d 734, 747 (Ill. 1994) (damages must be "a proximate, and not remote, consequence of the fraud."). This argument is not persuasive. The pleadings allege a scheme whereby Mosley was bribed into buying risky and unsuitable securities. As a result of this scheme, Sentinel claims losses close to $100 million.

Although Defendants chalk this loss up to market conditions, it is not unforeseeable at this stage that there would be little market for the resale of highly risky securities.  The trustee thus sufficiently pleads loss causation.

### 3. Illinois Consumer Fraud Act

Defendant Cohen challenges Plaintiff's standing with regard to this claim, arguing that Sentinel is not a consumer under the Act.  The ICFA defines "consumer" as "any person who purchases or contracts for the purchase of merchandise not for resale in the ordinary course of his trade or business but for his use or that of a member of his household."  815 Ill. Comp. Stat. § 505/1(e).  Sentinel argues that it is indeed a consumer, since it does not sell any products to customers and provides only cash management services.  However, Plaintiff's own allegations demonstrate that the securities at issue would, most likely, be resold at some point.  Although Sentinel transferred its securities to repo counterparties, where they served as collateral for loans, Sentinel's allegations that Defendants were deceptive in failing to advise Sentinel of the lack of a market for these securities indicates that Sentinel contemplated their sale in a situation, such as the one alleged, where the repo counterparty ends its financing of the security.

Furthermore, Sentinel is a sophisticated entity involved in the purchase of non-registered securities. "The interests of such entities, which are fully capable of protecting themselves via contract and tort law, are not the kind the statute is designed to protect." *Ivanhoe Financial, Inc. v. Highland Banc Corp.*, No. 03 C 7336, 2004 WL 2091997, at * 6 (N.D. Ill. 2004).  Nor can Trustee establish a consumer nexus since it cannot, by the nature of the securities at issue, plead that Defendants' actions involved consumer protection concerns.[6]  Defendants' motion to dismiss

---

[6] To establish a "consumer nexus," a plaintiff must plead:

(1) that their actions were akin to a consumer's actions to establish a link between

the Illinois consumer fraud act claim is granted.

### 4. Negligence

Trustee's negligence claim is properly pled.  Plaintiff points to cases that support its proposition that a negligence claim is available in unsuitability cases.  *See, e.g., Javitch v. First Montauk Fin. Corp.*, 279 F. Supp. 2d 931, 938 (N.D. Ohio 2003) (allowing negligence claim against broker and firm where customer opened non-discretionary accounts using diverted funds)*; Piper, Jaffray & Hopwood Inc. v. Ladin, 399 F. Supp. 292, 299-300* (S.D. Iowa 1975) (holding broker liable for negligence for violating NASD suitability rule).  Defendants' argument that there is no cause of action for negligent violations of the securities exchange rules misses the point.  Plaintiff is not alleging violations of those rules as part of this claim, but rather violations of a duty rooted in industry standards.  Trustee's negligence claim survives the motion.

### E.  Fraudulent conveyance

Pursuant to 11 U.S.C. § 548(a)(1)(A),

> [t]he trustee may avoid any transfer (including any transfer to or for the benefit of an insider under an employment contract) of an interest of the debtor in property, or any obligation (including any obligation to or for the benefit of an insider under an employment contract) incurred by the debtor, that was made or incurred on or within 2 years before the date of the filing of the petition, if the debtor voluntarily or involuntarily—
>
> (A) made such transfer or incurred such obligation with actual intent to hinder, delay, or defraud any entity to which the debtor

---

them and consumers; (2) how defendant's representations . . . concerned consumers other than themselves; (3) how defendant's particular [actions] involved consumer protection concerns; and (4) how the requested relief would serve the interests of consumers.

*Brody v. Finch Univ. of Health Sciences / The Chicago Medical School*, 698 N.E.2d 257, 269 (Ill. App. Ct. 1998).

> was or became, on or after the date that such transfer was made or
> such obligation was incurred, indebted[.]

A general scheme or plan to strip the debtor of its assets without regard to the needs of its creditors can support a finding of actual intent. *Wieboldt Stores, Inc. v. Schottenstein*, 94 B.R. 488, 504 (N.D. Ill.,1988) (leveraged buy out was structured in such a way as to evade fraudulent conveyance liability). Defendants maintain that the transactions between itself and Sentinel are not in and of themselves fraudulent. *See In re First Alliance Mort. Co.*, 471 F.3d 977, 1009 (9th Cir. 2006). Sentinel paid for securities and got securities in return. Trustee, Defendant Cohen argues, is conflating Sentinel's state of mind with regard to its customers with its intent in purchasing CDOs. *See In re First Alliance Mortg. Co.*, 471 F.3d 977 (9th Cir. 2006), (where debtor was defrauding borrowers, its legitimate payments to its own lender were not in and of themselves fraudulent, thus defeating trustee's claim of fraudulent transfer). To do so, argues Cohen, would allow Sentinel to undo every transaction involving anyone who provided any good or service to Sentinel within the statutory period. However, Plaintiff alleges that the specific transactions alleged were part of a fraudulent scheme to misuse customer assets. The "segregated" customer money was used as part of a massive leveraging scheme, the profits of which funded risky investments for the benefit of Sentinel insiders, allegedly done with little regard for Sentinel's clients. According to Trustee, these were not legitimate payments to Sentinel service providers. They were transactions tainted by bribery and fraud, and Sentinel insiders concealed the larger, encompassing fraud by sending customers fictitious account statements, an indication of actual intent to hinder, delay, or defraud Sentinel and its clients. Mosley's own attempts to benefit from these conveyances and the possibility that he lacked judgment do not preclude Trustee's allegations of intent.

### F.  KBW's Motion to Sever

KBW moves to sever any remaining claims from the claims against Defendant Cohen. Federal Rule of Civil Procedure 20(a)(2) permits joinder of defendants if "any right to relief is asserted against them jointly, severally, or in the alternative with respect to or arising out of the same transaction, occurrence, or series of transactions or occurrences; and any question of law or fact common to all defendants will arise in the action."  Trustee argues that KBW's motion to sever should be denied on the ground that the claims are "transactionally related," because individual Defendants Mohr and Rodriguez "concocted a fraudulent scheme while they were employed by KBW, operated it (with the help of their superiors) on behalf of KBW for more than two years, and then moved to Cohen, where (with the help of their new bosses) they did the same thing."  However, it does not appear that Plaintiff seeks to hold the Defendants here jointly, severally or alternatively liable for the complained-of conduct. Furthermore, the transactions in question, though allegedly part of a larger scheme, took place during different time periods and under the supervision of two different employers.  Though similar in type, the alleged bribery and sales conduct differed in quantity and degree, and joinder is not proper here.  KBW's Motion to Sever is granted.

**IV. CONCLUSION**

For the foregoing reasons, their motions to dismiss count 6, the Illinois Consumer Fraud Act claim, is granted as to all Defendants, and their motions to dismiss the remaining claims are denied. KBW's Motion to Sever is granted.

ENTER:

_____
James B. Zagel
United States District Judge

DATE: July 9, 2009